SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**US Masters Residential Property (USA) Fund v. New Jersey Department of Environmental Protection (A-78-17) (081137)**

**Argued March 11, 2019 -- Decided July 29, 2019**

**LaVECCHIA, J., writing for the Court.**

The Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.34 ("Spill Act" or "Act") creates a means by which the State can provide monies for a swift and sure response to environmental contamination from the discharge of hazardous substances -- the Spill Compensation Fund ("Spill Fund" or "Fund"). The Legislature tasked the State, presently the Department of Environmental Protection (DEP), with the responsibility to quickly deploy entrusted public funds to restore the environment and abate damages. In order to resolve disputes over denied Fund monies quickly and fairly, the Fund uses arbitrators and flexible procedures to allow claimants the opportunity to demonstrate that the denial constituted arbitrary and capricious action.

Invocation of that system for claim review was neither swift nor fair to the claimant in this instance. Disaster had hit in the form of Superstorm Sandy. Petitioner, US Masters Residential Property (USA) Fund ("US Masters"), submitted a claim for Spill Fund monies in November 2012, along with a report from Gregory Brown, a licensed site remediation professional, for its multi-lot property located in Bayonne that was affected by the storm's floodwaters, which allegedly carried petroleum-based toxins.

The DEP acknowledged that there was staining on the interior walls of the homes on the property but noted that US Masters had not provided a laboratory analysis to demonstrate that the material was a "discharge of a hazardous substance" as defined by the Act. The DEP also noted that it interpreted the lab results in Brown's report to be indicative of soil contaminated by historic fill. Under its historic fill theory, the DEP maintained that US Masters had not proved a discharge compensable under the Spill Act because historic fill is not an oil discharge and the toxins pre-dated the enactment of the Spill Act. Following some back and forth, petitioner's claim was denied.

US Masters filed a Request for Arbitration on February 4, 2014 and, after a convoluted history during which the DEP delayed providing discovery, obtaining an expert, and providing that expert's report, arbitration was not scheduled until February 1,

1

2016.  The DEP did not file Dr. Dennis Stainken's report until mid-January 2016, shortly prior to the scheduled February 1, 2016 hearing start date.

Importantly, petitioner contends that in that report the DEP altered its reasons for supporting the denial.  Although Stainken agreed with the DEP's position that the soil samples from the property indicated the presence of historic fill, he added that, in his opinion, Diffuse Anthropogenic Pollution (DAP) -- which DEP defines as "contamination from broadly distributed contaminants, often arising from multiple sources" including "atmospheric deposition" as well as "random, non-attributable, non-point sources" -- was likely an additional source of contamination.

US Masters moved to exclude Stainken's report, citing the DEP's dilatory tactics and its introduction of a new theory about the identity and source of the toxic materials on the eve of the arbitration.  The arbitrator denied that motion.  At the hearing, US Masters sought to use responsive expert material that was hurriedly obtained and shared with the DEP.  The arbitrator rejected the use of the additional scientific material.

On April 4, 2016, the arbitrator rendered a decision dismissing US Masters's claim.  The arbitrator determined that US Masters did not prove by a "preponderance of the evidence that the damage to its property was caused by a post-Act discharge of hazardous substances."  Instead, the arbitrator found it probable that the contamination was caused by DAP that had settled in the bottom of nearby waterways and was then churned up and deposited on land during Superstorm Sandy.  The arbitrator characterized that theory as having been proffered by Stainken.

The Appellate Division affirmed the arbitrator's determinations.  The Court granted the petition for certification filed by US Masters.  234 N.J. 312 (2018).

**HELD:**  Flaws in the substantive reasoning of the arbitration decision as well as procedural fairness considerations undermine confidence in the outcome of this arbitration enough to persuade the Court, in the interest of fairness, to require that a new arbitration be conducted.

1.  A Spill Fund claimant must show "by a preponderance of the evidence that the claim satisfies all requirements for eligibility," N.J.A.C. 7:1J-2.3, one of which is to demonstrate that a qualifying hazardous discharge occurred.  After receiving a denial by the DEP, a claimant may request arbitration, which provides an opportunity for the claimant to dispute the facts relied on by the DEP to deny the eligibility of a claim.  At all times, however, the burden of proof is on the claimant.  (pp. 17-19)

2.  Once the claim is in the arbitral forum, the arbitrator is allowed "complete discretion regarding discovery" but must "exercise such discretion in light of the expedited nature of Spill Fund Arbitration."  N.J.A.C. 7:1J-9.7(a).  Arbitrators also have been given wide

2

latitude in the admission of evidence. N.J.A.C. 7:1J-9.11. Under the Spill Act, arbitration of a claim produces the agency's final quasi-judicial decision. N.J.S.A. 58:10-23.11n(g). An agency's quasi-judicial decision is not disturbed on appellate review unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record. A lack of fair support is demonstrated by the decisionmaker's failure to consider all the evidence in a record, or the complete misperception of the facts submitted in a record. (pp. 19-21)

3. In finding that DAP, which the arbitrator stated had settled at the bottom of nearby waterways and was churned up and deposited on land due to Superstorm Sandy, was the likely probable contamination on the US Masters property, the arbitration decision specifically ties that explanation to Stainken's testimony. However, Stainken's discussion about sediment from nearby bodies of water came in the context of explaining the stains observed on the inside walls of the homes on the property. His testimony about DAP came elsewhere, in the context of addressing the results from the chemical analysis of the soil samples. The arbitrator's reliance on a DAP finding was ultimately important because the arbitrator rejected the DEP's historic fill theory. Importantly, the DEP does not contest before this Court that the arbitrator's theory about DAP is not contained in Stainken's testimony. Instead, it postulates that the theory was a reasonable inference about how DAP could migrate -- but no evidence to support that such migration took place is in this record. The Court is left with the impression that the arbitrator's misperception about the DAP theory constitutes the type of misperception of the facts that can render an agency decision infirm, as arbitrary and capricious, and that warrants intervention. (pp. 22-24)

4. The Court's confidence in the results of this arbitration proceeding is further undermined by the arbitrator's pre-hearing determination to prevent US Masters from presenting its late-produced responsive scientific evidence pulled together after receipt of the late-shared expert report. Discovery procedures and their compliance are designed to enhance truth seeking. Yet that is not what can be said to have occurred here. When Stainken's report with its new DAP theory was shared, US Masters was at a clear disadvantage. The Court is unpersuaded that there was no way to fairly permit US Masters the opportunity to respond with its own scientific proof to counter that theory. The rejection of that scientific evidence and the concomitant preclusion of Brown from testifying fully about the reasons to discredit the DEP's position raise concerns that, coupled with the misperception of Stainken's testimony by the arbitrator, compel the Court to reverse and require a new hearing on the merits of this claim denial. (pp. 25-27)

**The judgment of the Appellate Division is REVERSED, the arbitration decision is VACATED, and the matter is REMANDED for a new arbitration proceeding.**

**JUSTICE FERNANDEZ-VINA, dissenting,** finds that the actual purpose of petitioner's excluded report was not to dispute a DAP theory offered by the DEP, but instead to challenge comments from more than two years earlier with information that had been available to US Masters since 2013.  Justice Fernandez-Vina therefore does not agree that the arbitrator's decision to deny the submission of that report fell outside the wide discretion afforded to arbitrators in ruling on discovery issues.  Justice Fernandez-Vina further disagrees with the majority's conclusion that the inferences the arbitrator drew from Stainken's testimony misperceived the facts.  Justice Fernandez-Vina stresses that, because US Masters failed to prove by a preponderance of the evidence that a post-Spill Act discharge of oil damaged its property, the arbitrator's determination that flood waters containing DAP were the actual source of the damage -- an inference supported by site remediation requirements and Stainken's testimony -- is inconsequential.

**JUSTICES ALBIN, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion.  JUSTICE FERNANDEZ-VINA filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE PATTERSON join.**

4

# SUPREME COURT OF NEW JERSEY
## A-78 September Term 2017
### 081137

---

US Masters Residential
Property (USA) Fund,

Petitioner-Appellant,

v.

New Jersey Department of
Environmental Protection -
Financial Services Element,

Respondent-Respondent.

---

On certification to the Superior Court,
Appellate Division.

---

| Argued | Decided |
|--------|---------|
| March 11, 2019 | July 29, 2019 |

---

Lawrence S. Lustberg argued the cause for appellant (Gibbons and Ford O'Brien, attorneys; Lawrence S. Lustberg, Anne M. Collart, and Adam C. Ford, on the briefs).

A. Paul Stofa, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel, and A. Paul Stofa, Lauren C. Brick, Deputy Attorney General, and Mark S. Heinzelmann, Deputy Attorney General, on the briefs).

1

Since 1976, New Jersey and its residents have had the benefit of the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.34 ("Spill Act" or "Act"). The Act creates a means by which the State can "provide monies for a swift and sure response to environmental contamination" from the "'discharge of petroleum products and other hazardous substances.'" Marsh v. DEP, 152 N.J. 137, 144 (1997) (quoting N.J.S.A. 58:10-23.11a). The Spill Compensation Fund ("Spill Fund" or "Fund") was created to enable the State to respond with quick cleanups in emergency situations, as well as to address other cleanup needs. Ibid.; see N.J.S.A. 58:10-23.11i (creating the Spill Fund). With the creation of the Fund, the Legislature tasked the State, presently the Department of Environmental Protection (DEP), with the responsibility to "quickly deploy entrusted public funds to restore the environment and abate damages" and to act as the "keeper of the public purse." Buonviaggio v. Hillsborough Twp. Comm., 122 N.J. 5, 10 (1991).

So when a toxic disaster hits, claimants may seek relief in the form of assistance from the Spill Fund by following promulgated claims procedures. In order to resolve disputes over denied Fund monies quickly and fairly, the Fund uses arbitrators and flexible procedures to allow claimants the

opportunity to demonstrate that the denial constituted arbitrary and capricious action.

Invocation of that system for claim review was neither swift nor, we fear, fair to the claimant in this instance. Disaster had hit in the form of Superstorm Sandy. Petitioner, US Masters Residential Property (USA) Fund ("US Masters"), submitted a claim for Spill Fund monies for its multi-lot property located in Bayonne that was affected by the storm's floodwaters, which allegedly carried petroleum-based toxins. Neighboring properties also affected by the storm's toxin-laden floodwaters were afforded Spill Fund relief. The process involved in the instant matter took a different course. Following some back and forth with the DEP, petitioner's claim was denied.

After petitioner filed an appeal, two years elapsed between the request for arbitration and the commencement of the arbitration proceeding. An extensively delayed discovery stage resulted in the DEP not filing its expert's report until mid-January 2016, shortly prior to the scheduled February 1, 2016 hearing start date. Importantly, petitioner contends that in that report the DEP altered its reasons for supporting the denial. At the hearing, US Masters sought to use responsive expert material that was hurriedly obtained and shared with the DEP; however, the arbitrator rejected the use of the additional scientific material. The arbitration hearing then proceeded over scattered days,

3

spanning weeks, resulting in an allegedly flawed decision, which petitioner contends is based on misconceptions by the arbitrator about the evidence of record. Those arguments focus chiefly on the import of the DEP expert's testimony and the new theory advanced about the contamination found on the site.

Generally, review of an arbitrator's decision is limited. Although an arbitration process is employed for Spill Fund disputes, the administrative decision that results remains reviewable for fundamental fairness and to ensure that the ultimate decision is not inconsistent with the evidence and the remedial purposes of the Spill Act. We have concerns about this proceeding. Although we are mindful of the deferential standard of review, flaws in the substantive reasoning of the arbitration decision as well as procedural fairness considerations undermine confidence in the outcome of this arbitration enough to persuade us, in the interest of fairness, to require that a new arbitration be conducted. Accordingly, we reverse and remand this claim for a new proceeding.

I.

A.

Petitioner US Masters owns several contiguous plots of land in the City of Bayonne ("the Property"). In the wake of Superstorm Sandy, police, the

4

DEP, and news outlets reported that floodwaters had carried and deposited oil -- or an oil-like substance -- onto land in Bayonne near the Property. In the weeks following the storm, multiple employees of US Masters visited the Property and reported seeing and smelling what they believed to be oil deposited by floodwaters. They specifically noted two-and-a-half-foot-high stains on the interior and exterior walls of the homes and cars in the area, similar to a "tub ring."

Believing the damage to be the result of an oil spill caused by Superstorm Sandy, US Masters filed a Spill Compensation Fund Damages Claim with the DEP on November 28, 2012, in accordance with N.J.A.C. 7:1J-2.1 to -2.6. In response to the claim, the DEP inspected the Property on December 20, 2012. As part of the claims process, US Masters also submitted a report from Gregory Brown, a licensed site remediation professional, who was hired to document the damage to the Property and its cause. On January 4, 2013, Brown collected six soil samples from the backyard of the Property and crawl spaces underneath the homes on the Property and sent the samples to an outside laboratory to have their chemical compositions analyzed.

Brown's report indicated that three of the samples contained hydrocarbons at levels that would require further screening under DEP regulations. Further, Brown stated that when visiting the property he saw and

5

smelled oil. Brown did not test the chemical composition of the "tub ring" material inside the buildings but, based on the totality of his observations, he concluded that the site was unfit for human habitation due to oil contamination.

On July 2, 2013, the DEP issued a Notice of Intent to Deny (NOI) US Masters's claim, in accordance with N.J.A.C. 7:1J-6.6(b). The DEP attributed damage on the Property to non-oil causes -- such as floodwaters, a fire, and a broken water pipe -- making the damages ineligible for compensation under the Act. The DEP noted that its March 13, 2013 inspection found no visible or olfactory evidence of oil on the Property, contrary to the observations of US Masters's employees. The DEP acknowledged that there was staining on the interior walls of the homes on the Property but noted that US Masters had not provided a laboratory analysis of the staining to demonstrate that the material was a "discharge of a hazardous substance" as defined by the Act.

The DEP also noted that it interpreted the lab results in Brown's report to be indicative of soil contaminated by historic fill[1] rather than oil. Under its historic fill theory, the DEP maintained that US Masters had not proved a

---

[1] Historic fill is "non-indigenous material, deposited to raise the topographic elevation of [land], which was contaminated prior to emplacement . . . and which includes, without limitation, construction debris, dredge spoils, incinerator residue, demolition debris, fly ash, or non-hazardous solid waste." N.J.A.C. 7:26E-1.8.

6

discharge compensable under the Spill Act because historic fill is not an oil discharge and the toxins pre-dated the enactment of the Spill Act.  While it noted that one of the six soil samples contained a hydrocarbon inconsistent with historic fill -- naphthalene -- the DEP stated that the naphthalene levels required further testing in accordance with N.J.A.C. 7:26E-4.2 before the site could be deemed "unfit for human habitation."  Therefore, the DEP concluded that US Masters had not shown that the damage to the Property was the result of hazardous discharge as defined by the Act.

In response to the denial, and in accordance with N.J.A.C. 7:1J-6.6(c), US Masters submitted an affidavit from Brown, contesting that the soil sample was indicative of historic fill.  According to Brown, oil had "floated in a thick layer on the flood waters and then smeared vertically along all surfaces as the flood waters receded."  We note that US Masters included in the record photos showing horizontal floodmarks with such vertical smears on buildings and cars in Bayonne.  US Masters's submission did not include additional chemical testing of the previously collected soil samples or new testing of the wall stains.

On December 16, 2013, the DEP responded with an amended NOI which reiterated the same grounds for denial.  See N.J.A.C. 7:1J-6.6(e)(2), (f).

B.

US Masters filed a Request for Arbitration on February 4, 2014, per

N.J.A.C. 7:1J-6.6(g), and, after a convoluted history during which the DEP

delayed providing discovery, obtaining an expert, and providing that expert's

report, arbitration ultimately was not scheduled until February 1, 2016.

The DEP hired Dr. Dennis Stainken as its expert witness, and he visited

the Property on January 5, 2016, more than five years after Superstorm Sandy.

On January 11, 2016, Stainken submitted his expert report in which he

analyzed the lab reports of the soil samples that had been procured by Brown

back in January 2013. Stainken's report addressed the types of hydrocarbons

found in the soil samples and asserted that the hydrocarbons were not of the

type found in petroleum. Rather, he asserted that the hydrocarbons were more

likely derived from vegetation or microbials. Stainken also opined that the ion

chromatogram testing results in Brown's report resembled chromatograms for

soot or diesel exhaust, not oil.

Based on his analysis, Stainken agreed with the DEP's position that the

soil samples provided by Brown indicated the presence of historic fill;

however, he added that, in his opinion, Diffuse Anthropogenic Pollution

(DAP) was likely an additional source of contamination.[2]

_____

[2] The DEP defines DAP as "contamination from broadly distributed
contaminants, often arising from multiple sources. DAP generally arises from

8

The next day, on January 12, 2016, US Masters filed a motion in limine to have Stainken's report excluded from evidence. It contended in motion papers that the report was untimely and was a continuation of the "dilatory conduct" by the DEP. US Masters pointed out in its motion filing that it had already filed multiple discovery deficiency letters against the DEP and, further, that on May 21, 2015, the arbitration hearing commencement date was adjourned -- from July 2015 to February 1, 2016 -- specifically to allow the DEP to retain an outside expert. And, in August 2015, according to the motion record, DEP petitioned to expand the issues to be considered at the arbitration. Yet, the DEP did not provide Stainken's report, with its new theory about the identity and source of the toxic materials, until the eve of the arbitration.

On the first day of the arbitration proceedings, February 1, 2016, the arbitrator denied US Masters's motion, referring to reasons provided in a previous telephone conference -- the substance of which is not contained in the record before this Court. However, on this record, the arbitrator stated only that he "accept[ed] the DEP's explanation as to the time of the report."

---

atmospheric deposition, but may also contain contributions from random, non-attributable, non-point sources." DEP Site Remediation Program, <u>Diffuse Anthropogenic Pollution (DAP) Administrative Guidance</u> (Apr. 30, 2013), https://www.nj.gov/dep/srp/guidance/srra/dap_guidance.pdf.

While the motion to exclude Stainken's report was pending, US Masters commissioned Brown to produce a response to the report.[3] Brown's additional material consisted of an expedited laboratory analysis and report on samples of contaminants from within the homes, including samples of the wall where the "tub ring" stains had formed. The report indicated that the testing of samples taken from the walls demonstrated a close match to hydraulic fluid.[4] US Masters received a summary of the report on January 29, 2016 and a full version of the report on February 2, 2016. It provided both reports to the DEP on the same day each was received.

The DEP objected to the admission of the report into evidence. The arbitrator determined the new report was inadmissible through Brown, US Masters's witness. He cited grounds of hearsay, a lack of information as to who conducted the chemical analyses (making them untrustworthy), and the timing of the submission. The record is devoid of discussion about

---

[3] The dissent states that Brown's report was not in response to the Stainken report, but rather was written to rebut the DEP's initial motion for summary judgment. In making that assertion, the dissent relies on a cover letter written by Brown -- who is not a lawyer -- that he sent with the summary of his report on January 29, 2016. Unlike the dissent, we do not rely on a letter written by a non-lawyer to characterize the purpose of Brown's second report.

[4] This report was not initially contained in the record. However, after oral argument in this matter -- and by consent of both parties -- the second report and supporting correspondence were submitted to the Court.

10

augmenting the witness list to address those concerns.  That said, the arbitrator noted that he saw no reason that the samples from the interior walls could not have been taken and analyzed earlier.

Both Brown and Stainken testified at the arbitration and gave testimony largely in line with their reports.  US Masters's employees testified to their observations of the Property on site visits.

During Brown's testimony, he conceded that the presence of naphthalene was not dispositive of oil, but he asserted that the naphthalene in the soil sample in combination with the multiple visual and olfactory observations of oil in the wake of the storm, reports of oil spills in the area, and numerous nearby sources of oil indicated that the damage to the Property was from oil discharges carried onto the Property by stormwaters.  He acknowledged that some of the contamination in the soil could have been the result of DAP but, given the other evidence of oil, that the contribution was likely small.

Stainken testified about the conclusions in his report and also that, when he visited the Property in December 2015, he did not detect any odor of oil. He conceded that there were "tub ring" stains on the walls of some of the homes but added that he believed those stains were caused by silt clay in the floodwaters, not by oil.  He explained that

> what happens is if you look at the sediment process in
> New York Harbor, and Arthur Kill in Perth Amboy and

11

this area, and even lower New York Bay, you have a continuous rain down of very fine materials, silts and clays. . . . It's as fine as talcum powder and -- when you dry it out. Larger fractions then become, along with the clays, you get a silt fraction which is that really fine super gritty stuff. They congeal down on the bottom and they're one of the reasons why periodically you have to dredge channels because it just fills in.

When you have high wave action and storm action, whatever you see above in the water column goes down in multiple cells down below so that whatever the wave pattern is up above here on the surface is going all the way down to the bottom to kick the bottom up. You can actually -- if you're a scuba diver you can actually see that sometimes off the coast. We call it "marine snow," . . . or "suspended particulars," but again in a big storm this stuff is carried along and even like today if you go outside and look at the Hackensack, the Passaic, the Raritan they're brown. And they're carrying another load down, and in a flood or in a big storm they come right back up.

On cross examination, when confronted with reports of other oil spills in the area, Stainken noted that,

having seen lots of floods . . . what we saw was a lot of smelly sediment . . . and I've seen firsthand that a lot of marsh muds and other stuff, when it's disseminated in storms, the odiferous components are similar to the smells of a lot of different oils so I can't say one way or another what [the other claims] indicate[]. I can only talk about what the [soil sample tests] said.

C.

On April 4, 2016, the arbitrator rendered a decision dismissing US Masters's claim. The arbitrator determined that US Masters did not prove by a

12

"preponderance of the evidence that the damage to its property was caused by a post-Act discharge of hazardous substances." Instead, the arbitrator found it probable that the contamination was caused by DAP that had settled in the bottom of nearby waterways and was then churned up and deposited on land during Superstorm Sandy. The arbitrator characterized that theory as having been proffered by Stainken.

The arbitrator did not credit US Masters's employees' observations of oil-like odors and stains on the Property, finding the claims to be the product of a "lack of training" and "exaggeration." He also noted that "oil and DAP contain many of the same chemical compounds" and therefore reports of oil spills in the surrounding areas were likely a result of an inability on the part of observers to "tell the difference between oil and DAP in the muck from the bottoms of waterways in the area."

Finally, it bears noting that, in coming to his conclusion, the arbitrator expressed his belief that "the floodwaters which inundated the area carried substances onto the properties," and that contaminants found in the soil samples were not from historic fill.

### D.

US Masters appealed the arbitrator's decision on two points relevant to the instant appeal. First, it claimed that the arbitrator's finding that

13

contamination on the Property was from underwater DAP deposits was not supported by evidence in the record but rather demonstrated that the arbitrator had misconstrued the evidence presented about the DAP theory espoused by the DEP through Stainken.  Second, it argued that the arbitrator erred in admitting Stainken's report and denying US Masters's second report because Stainken's report was submitted close to the start of arbitration and introduced a new theory of contamination -- DAP -- that was not present in the DEP's NOI.

In an unpublished opinion, the Appellate Division affirmed the arbitrator's substantive decision, concluding that there was substantial credible evidence in the record to support the arbitrator's findings.  In any event, the Appellate Division determined that US Masters had not met its burden of proof because it did not rebut Stainken's interpretation of the lab results.

The Appellate Division also affirmed the arbitrator's procedural determinations to admit Stainken's report while excluding US Masters's responsive report, citing the "complete discretion regarding discovery" granted to arbitrators by N.J.A.C. 7:1J-9.7(a).  In determining that US Masters "failed to demonstrate any prejudice" due to admission of the report, the panel did not take issue with the DEP's introduction of the theory that DAP was a source of contamination for the first time in Stainken's report.  The panel noted that the

DEP reserved the right to provide additional reasons for rejection in its initial and amended NOI, commenting moreover that the overarching position of the DEP had not changed -- that US Masters failed to meet its burden of proving that the damage to its property was caused by a post-Act discharge of hazardous substances.  Further, the Appellate Division determined that the decision to bar admission of US Masters's second report did not constitute an abuse of discretion.  The panel rejected US Masters's argument that the necessity of the additional testing arose only when Stainken submitted his new DAP theory, reasoning that US Masters had not explained why the same tests were not previously necessary.

US Masters filed a petition for certification, which we granted.  234 N.J. 312 (2018).

## II.

### A.

US Masters asserts that in affirming a decision that relied on chemical analyses in lieu of what it characterized as significant observational evidence of an oil spill, the Appellate Division created a new burden of proof that requires all Spill Act claimants to prove a hazardous discharge occurred through specific laboratory tests.  US Masters alleges that this singular focal point runs contrary to the Spill Act's remedial purpose and case law.

Additionally, US Masters maintains that it has consistently asserted that the arbitrator's handling of the discovery issues constituted an abuse of discretion and emphasized the procedural unfairness permeating the resolution of this claim dispute.  It asserts that its objections have been consistent with its contention that basic tenets of procedural due process were violated in this matter when the arbitrator admitted Stainken's expert report -- which contained a rationale for denial not included in the initial NOI -- but refused to admit US Masters's responsive report, as well as when the arbitrator based his decision on a theory of contamination that was not proffered by either party's expert witness.  The latter, it claims, deprived US Masters of requisite notice for a fair hearing.  Again regarding the latter point, it also claims that the arbitration decision misconstrued the evidence of record.

## B.

The DEP contends that the arbitration decision merely applied the established law that a claimant must demonstrate by a preponderance of the evidence that its land was damaged by post-Act hazardous discharge.  The DEP notes that the arbitrator acknowledged and addressed the other sources of evidence put forth -- visual and olfactory observations, information concerning surrounding properties, and theories of expert witnesses -- but simply found that evidence less persuasive.

16

Additionally, the DEP argues that the arbitrator's decisions to admit Stainken's report but exclude US Masters's second report were fully within his broad discretion over both discovery and evidence, especially in light of the fact that US Masters did not articulate how the inclusion of a theory of DAP required additional evidence that a theory of historic fill did not. Additionally, the DEP asserts that the arbitrator's final decision and explanation for the hydrocarbons in the soil samples represented a reasonable inference from Stainken's testimony and was therefore supported by the record.

## III.

## A.

The DEP has promulgated regulations to provide an orderly process by which a claimant may receive assistance from the Spill Fund. See N.J.A.C. 7:1J-1.1 to -9.24. The DEP characterized the collective purpose of the regulations as one intended

> to ensure that payments to claimants from the Spill Fund are used to compensate the claimants only for damages that result from discharges of hazardous substances, and not from other causes. Implementation of the rules has eliminated many of the delays inherent in case-by-case decision making on individual claims, and has ensured consistency in the decision-making process of evaluating claims.

> [48 N.J.R. 205(b).]

17

The regulations require that a claimant show "by a preponderance of the evidence that the claim satisfies all requirements for eligibility." N.J.A.C. 7:1J-2.3. In addition to demonstrating that a qualifying hazardous discharge occurred, the requirements include demonstrating that damages are not "contingent or speculative"; the claimant "exercise[d] best efforts to obtain compensation from any other source from which compensation is reasonably likely to be available"; the claimant "exercise[d] reasonable diligence and ordinary care to mitigate or prevent the damages"; and any remediation is done by "environmentally sound means" and is "cost effective." N.J.A.C. 7:1J-2.4.

The DEP is required to deny any claim "which, on its face, appears to be ineligible for compensation." N.J.A.C. 7:1J-6.6(a). Before denying a claim, the DEP "may issue a Notice of Intent to Deny (NOI)," and "[t]he claimant may contest the NOI by submitting to the [DEP] additional evidence in support of the claim, and evidence that any material fact set forth in the NOI is incorrect." N.J.A.C. 7:1J-6.6(b), (c). If the claimant's response does not cure the claim's deficiencies, the DEP "shall prepare a written statement setting forth the denial and reasons therefor." N.J.A.C. 7:1J-6.6(f). After receiving the denial, a claimant may request arbitration and within that request must state "each fact disputed by the claimant which the [DEP] has asserted in the

18

denial of the claim" and an "assertion[] of the facts as the claimant believes them to be." N.J.A.C. 7:1J-6.6(g), (h)(1).

The arbitration process is thus an opportunity for the claimant to dispute the facts relied on by the DEP to deny the eligibility of a claim. At all times, however, the burden of proof, based on a preponderance of the evidence, is on the claimant.

B.

Once the claim is in the arbitral forum, the arbitrator is allowed "complete discretion regarding discovery" but must "exercise such discretion in light of the expedited nature of Spill Fund Arbitration." N.J.A.C. 7:1J-9.7(a). Arbitrators also have been given wide latitude in the admission of evidence. N.J.A.C. 7:1J-9.11. The arbitrator determines the "relevance and materiality" of all evidence, and "[s]trict conformity to the legal rules of evidence" is not required. N.J.A.C. 7:1J-9.11(b). That latitude includes the ability of the arbitrator to "consider evidence of witnesses by affidavit . . . after consideration of any objections made to its admission." N.J.A.C. 7:1J-9.11(e). And, further, the arbitrator is permitted to "relax any of the procedural requirements" of the Spill Act regulations if "strict adherence to such requirements would result in unfairness or injustice." N.J.A.C. 7:1J-6.8(a).

19

Under the Spill Act, arbitration of a claim produces the agency's final quasi-judicial decision. N.J.S.A. 58:10-23.11n(g). An agency's quasi-judicial decision is not disturbed on appellate review "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting Russo v. Bd. of Trs., PFRS, 206 N.J. 14, 27 (2011)). It is well settled that that standard applies in the review of Spill Fund arbitration decisions. See, e.g., Lacey Mun. Utils. Auth. v. DEP, 369 N.J. Super. 261, 273 (App. Div. 2004) (applying that standard in the review of Spill Fund arbitration decision); Handy & Harman v. Borough of Park Ridge, 302 N.J. Super. 558, 563 (App. Div. 1997) (same).

A lack of fair support is demonstrated by the decisionmaker's "failure to consider all the evidence in a record," or the "complete misperception of the facts submitted in a record." In re Proposed Quest Acad. Charter Sch. of Montclair Founders Grp., 216 N.J. 370, 386-87 (2013); see Constantino v. Merit Sys. Bd., 313 N.J. Super. 212, 218 (App. Div. 1998) (reversing an agency decision that was based on an arbitrator's misstatement and mischaracterization of testimony).

Also, a grant of wide discretion does not eliminate the appellate review function of ensuring that such proceedings adhere to basic fairness principles.

20

Regardless of an agency's particular procedures, any agency action must preserve a claimant's basic procedural due process rights.  High Horizons Dev. Co. v. DOT, 120 N.J. 40, 51-53 (1990).  Among the "most important procedural rights in . . . proceedings are adequate notice, a chance to know opposing evidence, and the opportunity to present evidence and argument in response."  In re Quest Acad., 216 N.J. at 384.  Enforcement of such principles ensures the "eliminat[ion], as far as possible, [of] concealment and surprise in the trial of lawsuits to the end that judgments therein be rested upon the real merits of the causes and not upon the skill and maneuvering of counsel." McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 376 (2001) (quoting Wymbs v. Township of Wayne, 163 N.J. 523, 543 (2000)).  Similarly, in the agency adjudication context, "an agency 'determination cannot rest upon undisclosed evidence which the parties have had no opportunity to test for trustworthiness or to explain or rebut.'"  Limongelli v. State Bd. of Dentistry, 137 N.J. 317, 328 (1993) (quoting Bhd. of R.R. Trainmen v. Palmer, 47 N.J. 482, 487 (1966)).  Thus, even when "discovery rules are to be construed liberally and broadly, '[c]oncealment and surprise are not to be tolerated.'"  Wymbs, 163 N.J. at 543 (alteration in original) (quoting Lang v. Morgan's Home Equip. Corp., 6 N.J. 333, 338 (1951)).

IV.

It is with such basic principles in mind that we review the proceedings in this matter. We turn first to the claim that the arbitrator's decision rested in part on a misperception of the evidence. Upon close review, we are compelled to agree.

In finding that DAP, which the arbitrator stated had settled at the bottom of nearby waterways and was churned up and deposited on land due to Superstorm Sandy, was the likely probable contamination on the Property, the arbitration decision specifically states in relevant part that

> Dr. Stainken envisioned a scenario in which DAP accumulated on the land and under the water for an extended period of time. The wave action from Superstorm Sandy churned up sediment from the bottom of nearby bodies of water, and the floodwaters carried large amounts of DAP onto the land.
>
> . . . .
>
> Dr. Stainken explained how DAP can accumulate in large amounts including on the bottom of waterways. In view of the power of Superstorm Sandy, it seems very realistic to assert that waves churned up the sediment, which included DAP, on the bottom of waterways in the area such as Upper New York Bay, the Kill Van Kull and Arthur Kill and that filthy floodwaters carried the muck onto the land. In view of the multiplicity of oil facilities in the area, it is reasonable to infer that there were many spills over the

22

decades.  Under the circumstances, in all probability events occurred as envisioned by Dr. Stainken.[5]

However, as petitioner correctly points out, that summary takes Dr. Stainken's testimony out of context.  His discussion about sediment from nearby bodies of water came in the context of explaining the "tub ring" stains that were observed on the inside walls of the homes on the Property.  Stainken testified about silt clay accumulating in water and being dredged up in a storm.  Specifically, he testified that he observed "[a] lot of silt -- silt clay."  He proceeded to explain the sedimentation process in New York Harbor and related areas, describing "marine snow," or "suspended particulars" that are very fine and fall to the bottom of waterways but "in a big storm this stuff is carried along . . . and in a flood or in a big storm they come right back up."

Stainken's testimony was that he observed such material inside the buildings on the Property.  He was not discussing DAP.  His testimony about

---

[5]  The dissent attempts to soften the arbitrator's mischaracterization of Stainken's testimony and report by saying that the arbitrator's findings were reasonable inferences based on the report and testimony.  But, the arbitrator explicitly characterizes his findings as coming directly from Stainken's report and testimony.  The dissent's reason for doing so is readily apparent.  The arbitrator's mischaracterization of critical testimony -- and therefore misunderstanding of the record -- is a clear basis for overturning the arbitration award.  As more reinforcement for the decision under review, the dissent further states that the arbitrator's inferences were reasonable in light of the Ecological Evaluation Technical Guidance document; however, that document was not in the record before the arbitrator, nor is there evidence that the arbitrator relied on that document in rendering his decision.

23

DAP came elsewhere, in the context of addressing the results from the chemical analysis of the soil samples.

The arbitrator's reliance on a DAP finding was ultimately important because the arbitrator rejected the DEP's historic fill theory. But the arbitrator's rendition of the testimony and reasoning for his finding based on a DAP theory appears to have combined different parts of Dr. Stainken's testimony to create a hypothetical scenario that Stainken did not express or endorse on this record. Importantly, the DEP does not contest before this Court that the arbitrator's theory about DAP is not contained in Stainken's testimony. Instead, it postulates that the theory was a reasonable inference about how DAP could migrate -- but no evidence to support that such migration took place is in this record.

We are left with the impression that the arbitrator's misperception about the DAP theory constitutes the type of misperception of the facts in this record that can render an agency decision infirm, as arbitrary and capricious, and that warrants our intervention. See In re Quest Acad., 216 N.J. at 386-87; Constantino, 313 N.J. Super. at 218. This misperception of the record undercut the fairness of the proceeding for petitioner because it compromised the adequacy of notice to petitioner of the proofs against it in what was petitioner's only opportunity to challenge the DEP's denial of its claim.

24

Our confidence in the results of this arbitration proceeding is further undermined by the arbitrator's pre-hearing determination to prevent US Masters from presenting its late-produced responsive scientific evidence pulled together after receipt of the late-shared expert report of Stainken. No doubt, the arbitrator enjoys much discretion over discovery. N.J.A.C. 7:1J-9.7. And, no doubt that, as the Appellate Division noted, the Stainken report was not produced outside of any discovery deadline established by the arbitrator. See generally N.J.A.C. 7:1J-9.8 (establishing procedures for requiring all evidentiary and related pre-trial matters to be addressed at least ten days prior to the arbitration). However, we do not believe the wholesale denial of petitioner's presentation, especially after Stainken's report introduced a new theory to support the DEP's denial, was in keeping with the fulfillment of the truth-seeking function of adversarial proceedings. The arbitrator's ability to waive or adjust requirements in the interests of justice provided the flexibility that appears to have been needed but was not exercised here. N.J.A.C. 7:1J-6.8(a).

Discovery procedures and their compliance are designed to enhance truth seeking. McKenney, 167 N.J. at 370. Enforcement of such procedures should result in the enhancement of truth seeking, not its inhibition. Ibid. Yet that is not what can be said to have occurred here. The record reveals that the

25

arbitrator plainly was concerned, and with good reason, to not delay this arbitration further. But options other than the flat refusal to admit petitioner's report were possible, and there is no evidence that alternatives were explored that would have enhanced the fairness and completeness of this proceeding in a way that balanced the interests of the parties. For example, while there may have been legitimate issues about whether Brown alone could provide a proper basis on which to admit the new scientific report and its summary, there was no effort displayed on this record to determine whether deficiencies could have been addressed on later dates of the arbitration proceeding -- which extended through the end of February 2016 -- or whether there were other efficient means for such gaps to be filled. See N.J.A.C. 7:1J-9.11(e) (permitting arbitrators to consider testimony via affidavit in certain instances).

In the end, though, the DEP was able to admit Stainken's late-produced report, notwithstanding numerous previous attempts by US Masters to make the DEP comply with discovery. When that report with its new DAP theory was shared, US Masters was at a clear disadvantage. We are unpersuaded that there was no way to fairly permit US Masters the opportunity to respond with its own scientific proof -- the merits of which we do not address -- to counter that theory. The rejection of that scientific evidence and the concomitant preclusion of Brown from testifying fully about the reasons to discredit the

26

DEP's position on US Masters's proofs for its claim, raise concerns that, coupled with the misperception of Stainken's testimony by the arbitrator, compel us to reverse and require a new hearing on the merits of this claim denial.

V.

For the reasons stated, we reverse the Appellate Division judgment, vacate the arbitration decision dismissing US Masters's claim, and remand this matter for a new arbitration proceeding.[6]

JUSTICES ALBIN, SOLOMON, and TIMPONE join in JUSTICE LaVECCHIA's opinion. JUSTICE FERNANDEZ-VINA filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE PATTERSON join.

---

[6] On remand, US Masters still bears the burden of demonstrating that it meets all requirements for compensation from the Spill Fund and will be required to address the additional grounds for denial proffered by the DEP that were not addressed by the arbitration decision.

27

US Masters Residential
Property (USA) Fund,

Petitioner-Appellant,

v.

New Jersey Department of
Environmental Protection -
Financial Services Element,

Respondent-Respondent.

JUSTICE FERNANDEZ-VINA, dissenting.

The majority's reversal of the arbitrator's decision is premised upon procedural arguments, as well as supposed flaws in the arbitrator's substantive reasoning. My review of the record does not reveal support for the majority's concerns. I therefore respectfully dissent.

I.

With respect to the question of procedural fairness, the majority concedes that arbitrators maintain "complete discretion regarding discovery," N.J.A.C. 7:1J-9.7, and that the report of Dr. Dennis Stainken dated January 11, 2016 (Stainken report) was not produced outside of any discovery deadline established by the arbitrator. Despite those concessions, the majority categorizes the Stainken report as a "late produced report" that includes a new

1

theory that DAP was a likely source of contamination. According to the majority, the arbitrator's wholesale denial of US Masters's second expert report of February 2, 2016 (the second report), which was purportedly commissioned to rebut the "new DAP theory," left US Masters at a clear disadvantage. I disagree.

A review of US Masters's second expert report reveals that the purpose of the report was to rebut the Department of Environmental Protection's (DEP) initial motion for summary judgment, which referenced statements made by DEP official, Frank Pinto,[1] in the Notice of Intent (NOI) he had issued -- not to rebut a new DAP theory. Indeed, the opening paragraph of the letter transmitted alongside the second report explicitly states:

> <u>This supplemental report is prepared in response to the Motions for Summary Judgment filed by the [DEP]</u> in the subject case. In that motion a representation was made in reference to <u>Mr. Frank Pinto's assertion that in his opinion the staining on the walls and floors of the building were nothing more than dirt.</u>
>
> <u>In order to test that assertion</u>, I visited the site yesterday . . . . I collected three samples, two of wallboard, one in the ground floor apartment[,] . . . and in the front hallway . . . .
>
> [(emphases added).]

---

[1] Frank Pinto is the Assistant Director of the Environmental Claims Administration of the Department of Environmental Protection.

2

The letter concludes: "It would appear that Mr. Pinto's assertions are unsupported by the facts." Notably, the letter and the accompanying report make no mention of DAP. The true intention of the second report is even more conspicuous in the context of the timeline of events in this matter.

When US Masters initially sought relief from the DEP on January 14, 2013, it submitted a report from Gregory Brown, who had collected and tested six soil samples from the relevant property. In that initial report, Brown noted that he "did not test the building interior or exterior materials such as plaster, wood flooring, siding, etc." In denying US Masters's claim on July 2, 2013, the NOI explained that "[n]o laboratory analysis of the staining was provided by the Claimant to demonstrate whether the staining is related to a discharge of a hazardous substance."

In response to this denial, US Masters submitted an affidavit from Brown on July 31, 2013, which concluded that the damage to the relevant property was "caused by a discharge of hazardous substances." But the affidavit failed to include any chemical testing of the wall stains.

On January 11, 2016, in compliance with the discovery deadlines established by the arbitrator, the DEP submitted the Stainken report, which concluded that the soil samples offered by US Masters contained historic fill and DAP, but not oil. Arbitration proceedings then began on February 1,

2016, at which time the arbitrator denied US Masters's motion to exclude the Stainken report. On February 2, US Masters submitted the second report supposedly rebutting Stainken's DAP theory.

At the arbitration hearing, US Masters stated that the lateness of the Stainken report was due to the DEP's failure to "give [US Masters the DEP's] expert report until the middle of January, two weeks before the arbitration [was] set to begin."[2] However, as noted above, the language in the second report directly contradicts US Masters's contention that the report was created to rebut the DEP's DAP theory. In addition to the noticeable absence of any mention of DAP in the second report, the report also plainly states that it was written to rebut "Mr. Frank Pinto's assertion that in his opinion the staining on the walls and floors of the building were nothing more than dirt," and "[i]n order to test that assertion, [Brown] visited the site . . . [and] collected . . . two [samples] of wallboard."

The information contained in the second report provides further evidence that the actual purpose of the report was not to dispute a DAP theory offered by the DEP, but instead to challenge Frank Pinto's comments in the initial NOI

---

[2] The record reflects that the DEP experienced difficulty in scheduling and securing access through US Masters to visit the relevant properties, which contributed to the delay.

4

from more than two years ago.  Critically, the second report -- which was submitted on February 2, 2016 -- consists solely of information that had been available to US Masters since its receipt of the NOI on July 3, 2013.

Thus, the timeline reveals the actual purpose of US Masters's submission of the second report.  In the first report submitted by US Masters, Brown noted that he "did not test the building interior or exterior materials such as plaster, wood flooring, siding, etc."  As noted above, the submission was denied, and the NOI explained that "[n]o laboratory analysis of the staining was provided by the Claimant to demonstrate whether the staining is related to a discharge of a hazardous substance."  Over two years then passed, and after the arbitration proceedings had commenced, US Masters attempted to provide that "laboratory analysis of the staining" under the guise of rebutting a new DAP theory offered by the DEP.

In sum, the second report (1) explicitly stated that it was prepared to rebut assertions made by Frank Pinto in the NOI, (2) made no reference to the "new DAP theory" it was supposedly commissioned to rebut, (3) provided information that had been available to US Masters for several years, and (4) was submitted after the arbitration proceedings had begun.  Those facts belie the majority's conclusion that the arbitrator's decision to deny the

5

submission of US Masters's second expert report fell outside the wide discretion afforded to arbitrators in ruling on discovery issues.

## II.

With respect to the arbitrator's substantive reasoning, I disagree with the majority's conclusion that the inferences the arbitrator drew from Stainken's testimony misperceived the facts.

When presiding over an issue brought under the Spill Act, an arbitrator "may grant any remedy or relief that [he or she] deems just and equitable and within the scope of the arbitration provision of the Act." N.J.A.C. 7:1J-9.16(e). An arbitrator also retains the discretion to "deny any claim upon a finding that a particular claim is invalid for any reason." Ibid. An abuse of discretion "arises when a decision is 'made without rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. INS, 779 F.2d 1260, 1265 (7th Cir.1985)).

During the arbitration proceedings in this case, Stainken agreed that "DAP is something that comes down from the atmosphere through burning or . . . human activities, [and] it builds up over a long period of time." Stainken further explained that,

> considering the age of this area and the time frame
> when the houses were first put up[,] I think [DAP]

6

would be expected[.] . . . More recently . . . in the last [forty] years or so, at least, you have a major highway going past [US Masters's property] with diesel trucks constantly coming running back and forth with diesel emissions which has been a major air pollution problem also.

US Masters's property and the emissions-emitting highway referred to by Stainken are both approximately one mile from both the Newark Bay and the Upper New York Bay. The arbitrator therefore reasonably inferred that, as a result of decades of pollution from the highly trafficked highway, DAP fell from the atmosphere into nearby bodies of water where "waves churned up . . . sediment, which included DAP, from the bottom of the waterways in the area . . . and . . . filthy floodwaters carried the muck onto [US Masters's] land."

That inference is supported by the Ecological Evaluation Technical Guidance document (guidance document), which "is designed to help the person responsible for conducting remediation comply with the NJDEP's requirements established by the Technical Requirements for Site Remediation . . . N.J.A.C. 7:26E," and provides "guidance for the evaluation of ecological risk in aquatic and terrestrial habitats associated with contaminated sites." New Jersey Dep't of Envtl. Prot., Site Remediation and Waste Management Program 8 (2018). The guidance document contains the following definition for the term "sediment":

unconsolidated material (<u>particles including</u> gravel, sand, <u>silt, clay and other natural and anthropogenic substances</u>) that has been deposited from water and settles to the bottom of a surface water body or within a wetland, and contains porewater. <u>All unconsolidated material below a waterbody is considered sediment for the purpose of remedial investigations and remedial actions</u> . . . .

[<u>Id.</u> at 18 (emphases added).]

The guidance document thus includes silt, clay, and anthropogenic substances in its definition of "sediment," which is described as "[a]ll unconsolidated material below a waterbody." <u>Ibid.</u> This supports the arbitrator's conclusion that the sediment churned up during Superstorm Sandy -- that Stainken testified contained "silts and clays" -- also contained the anthropogenic substance DAP. The arbitrator's ruling did not rest on an impermissible basis, and the arbitrator did not abuse his discretion in determining that US Masters's property was likely damaged by flood waters containing DAP.

Further, the Spill Act's regulations required US Masters to prove "by a preponderance of the evidence that [its] claim satisfie[d] all requirements for eligibility," N.J.A.C. 7:1J-2.3; they impose no burden on the DEP to prove that US Masters's claim failed to satisfy such requirements. Stated differently, US Masters was required to prove by a preponderance of the evidence that its property was damaged by a post-Spill Act discharge of oil. The DEP was not

8

required to prove that something other than oil was responsible for the damage.

Given that distinction, the arbitrator's findings regarding US Masters's lab results are critical:

> The analytical results are a reliable indication that there was no oil at the points from which the samples were taken. Those points were reasonably calculated, and in fact were biased[] to find oil. If oil was present in floodwaters on the property, it should have been detected by those tests. Yet none was found. Mr. Brown had no explanation for this result. Under the circumstances, the most reliable evidence indicates that there was no oil on this particular property.

Most importantly, because US Masters failed to prove by a preponderance of the evidence that a post-Spill Act discharge of oil damaged its property, the arbitrator's determination that flood waters containing DAP were the actual source of the damage is inconsequential. I therefore respectfully disagree with the majority's decision to reverse the arbitrator's ruling due to perceived flaws in his substantive reasoning.

For the foregoing reasons, I respectfully dissent.