771 A.2d 1153

JARRELL MCKENNEY, AN INFANT BY HIS GUARDIANS AD LITEM, EDWARD J. MCKENNEY, AND JANNIE MCKENNEY, AND EDWARD J. MCKENNEY AND JANNIE MCKENNEY, INDIVIDUALLY, PLAINTIFFS–APPELLANTS, v. JERSEY CITY MEDICAL CENTER, JERSEY CITY FAMILY HEALTH CENTER, ADMINISTRATORS, EMPLOYEES AND/OR OFFICERS OF THE JERSEY CITY FAMILY HEALTH CENTER 1 THRU 24 (FICTITIOUSLY DENOMINATED), ALEXANDER N. PREZIOSO, M.D., LONG–GUE HU, M.D., EUK KIM, M.D., DIRECTOR OF OB/GYN CLINIC OF THE FAMILY HEALTH CENTER AND

SIPRA DE, DEFENDANTS–RESPONDENTS, AND KRER-GRKRAI HASANEE, M.D., DILARA E. SAMADI, M.D., SURAC-HAT CHATKUPT, M.D., JOHN/JANE DOE PHYSICIANS 1 THRU 43 (FICTITIOUSLY DENOMINATED) AND RADIOLOGISTS/SO-NOGRAM READERS 1 THRU 49 (FICTITIOUSLY DENOM-INATED), DEFENDANTS.

Argued February 26, 2001—Decided May 16, 2001.

*Eric Stewart Lentz,* argued the cause for appellants (*Garces & Grabler,* attorneys).

*Sam Rosenberg,* argued the cause for respondent Long–Gue Hu, M.D. (*Reiseman Sharp Brown & Rosenberg,* attorneys).

*Roger G. Ellis,* argued the cause for respondent Sipra De (*Bumgardner & Ellis,* attorneys).

*Thomas H.E. Hallett,* argued the cause for respondents Jersey City Medical Center and Jersey City Family Health Center, Administrators, Employees and/or Officers of the Jersey City Family Health Center 1 thru 24 (fictitiously denominated).

*Judith A. Wahrenberger,* submitted a letter in lieu of brief on behalf of respondent Euk Kim, M.D. (*Wahrenberger & O'Brien,* attorneys).

*Craig S. Combs,* submitted a letter in lieu of brief on behalf of respondent Alexander N. Prezioso, M.D. (*Giblin & Combs,* attorneys).

The opinion of the Court was delivered by

COLEMAN, J.

This medical malpractice case raises two narrow issues: whether defense counsel has an obligation to communicate material

changes in defense witnesses' testimony to counsel for the plaintiffs when defense counsel discovers that there will be such change prior to the witness testifying, and whether plaintiffs were entitled to a mistrial when the anticipated change in testimony was not disclosed until after plaintiffs had rested. We conclude that because a mistrial should have been declared, plaintiffs are entitled to a new trial.

## I.

### A.

Plaintiffs Jannie McKenney (McKenney) and her husband brought this action on behalf of themselves and their infant son, Jarrell, seeking damages for wrongful birth, wrongful life, and injuries sustained during delivery. The complaint alleged that the Jersey City Medical Center (JCMC), the Family Health Center (FHC) (a subsidiary of the JCMC), and several of the JCMC/FHC staff members, failed to provide proper prenatal care and proper care at the time of delivery. On November 24, 1990, McKenney gave birth to Jarrell by vaginal delivery, and at delivery the doctors determined that Jarrell was afflicted with spina bifida. That condition involves a defect in the spinal column consisting of the absence of a vertebral arch through which the spinal membranes may protrude. *Stedman's Medical Dictionary* 1315 (5th Lawyers' ed.1982).

In addition, as explained by the Appellate Division:

> If a fetus has a neural tube defect, a midline defect of the vertebra, or spina bifida, there are associated changes of the brain at the top of the spinal column, leading to a partial collapse of the frontal part of the head. This "infolding" results in the head appearing "lemon-shaped," rather than oval. This is referred to as "lemon sign."
>
> [*McKenney v. Jersey City Med. Ctr.*, 330 *N.J.Super.* 568, 578, 750 *A.2d* 189 (App.Div.2000).]

Plaintiffs claim that "sonograms taken August 13, 1990 exhibited the presence of a lemon sign." *Ibid.* Plaintiffs contend that McKenney would have terminated her pregnancy if she had foreknowledge about Jarrell's condition, and that the doctors aggravated Jarrell's condition by performing a vaginal delivery rather than a caesarian section.

The complaint that was filed in November 1992 also named Dr. Long–Gue Hu; Sipra De; Dr. Alexander Prezioso, who treated McKenney in November 1990; and Dr. Euk Kim, who treated McKenney late in her pregnancy and who was also the director of the FHC in 1990. The claims against Drs. Prezioso, Kim, and Hu are based on their failure to detect the spina bifida in the ultrasound films and/or their failure to order a more targeted ultrasound study.

Plaintiffs also sued Dr. Kim in his capacity as FHC director for failing to ensure continuity of medical care at the FHC. The claims against Drs. Prezioso and Kim—the latter in his capacity as a treating physician—were limited to injuries sustained during delivery because those doctors did not treat McKenney until well into the third trimester.

Plaintiffs dismissed their independent claims against the JCMC and FHC because at that time the hospital was subject to a $10,000 limitation on liability, *see N.J.S.A.* 2A:53A–8, and plaintiffs preferred to risk no recovery than to allow a jury the option of finding only the capped defendants liable. The JCMC and FHC remained in the case solely in a *respondeat superior* capacity.

The theory of liability against De was that she failed to ensure that the sonogram images she took on August 13 and 16 were read and interpreted by a doctor. The trial court granted summary judgment to De in February 1997, dismissing the complaint for want of proof that De had deviated from the standard of care. The remaining defendants were precluded from using the "empty-chair" defense to argue to the jury that De was negligent. *See Bahrle v. Exxon Corp.,* 279 *N.J.Super.* 5, 22, 652 *A.*2d 178 (App.Div.1995), *aff'd on other grounds,* 145 *N.J.* 144, 678 *A.*2d 225 (1996).

## B.

McKenney became aware that she was pregnant in April 1990 with an anticipated delivery date of December 8, 1990. The FHC

treated her from August 1990 until the date of her delivery. She first appeared at the FHC with an appointment on August 10, 1990. At that time it was estimated that she was in the twenty-second or twenty-third week of her pregnancy. McKenney was examined by Dr. Hasanee and instructed to undergo a sonogram. The sonogram was performed on August 13, 1990 at the JCMC by Sipra De, a certified ultrasound sonographer, to determine the gestational age of the fetus. The sonogram normally would have been performed at the FHC, but because the FHC sonogram machine was broken in August 1990, the sonograms for FHC patients were performed at the JCMC. The JCMC is located in a separate building several blocks away from the FHC. According to plaintiff's expert's testimony, one of the sonogram images taken on August 13 clearly indicated that Jarrell had spina bifida. De testified at her depositions that she did not detect a "lemon sign" from the sonograms, but she noted the presence of a "membrane" associated with twins in one of the sonogram images. The JCMC's protocols required De to notify a doctor if anything "questionable" appeared on the sonogram.

Dr. Hu, the chief Obstetric/Gynecological (Ob/Gyn) resident at the JCMC was assigned to the FHC for the month of August. He reviewed the August 13 sonograms, but did not detect spina bifida. However, there is uncertainty concerning when Dr. Hu reviewed the August 13 sonograms. In his depositions, Dr. Hu testified that the August 13 sonograms were probably taken at the FHC, and because he was stationed at the FHC when those sonogram images were taken he admitted that he probably reviewed them on August 13. Dr. Hu changed his testimony at trial, however, stating that upon review of a JCMC sonogram log book that plaintiffs' counsel had sought unsuccessfully to obtain during discovery, he was able to determine that the August 13 sonograms were, in fact, performed at the JCMC. Examination of the log book persuaded Dr. Hu to testify at trial that he probably did not review the August 13 sonograms until near the end of August. That change in testimony was critical because other facts at trial indicated that on August 13, McKenney was at or near twenty-

four weeks into her pregnancy, and she would not have been able to secure a legal abortion in New Jersey in 1990 after the twenty-fourth week.

As noted previously, De was named a defendant, but the trial court granted summary judgment dismissing the complaint against her between five and six months before the trial commenced. The August 13 sonogram report contained a number of notations, most of which were attributed to Dr. Hu. One important notation—"follow-up study suggested"—was not. At her deposition, De testified that she did not make that notation and did not know who had made it. At trial, however, De admitted that she had made the notation. That admission suggested that, in contrast to her deposition testimony, her skills exceeded those of a "mere" technician.

De testified at her deposition and at trial that a doctor (who plaintiffs were never able to identify) reviewed the August 13 sonograms at the JCMC on August 13. That unidentified doctor informed De that he detected abnormalities on the sonogram images indicating that McKenney might have had a "vanishing twin" (a condition in which the mother is pregnant with twins but one of the twins dies and is absorbed early in the term), and instructed De to order a specialized sonogram study by a "high-risk" radiologist. The accuracy of that surprising trial testimony also was called into question. De scheduled a sonogram for August 16 to be performed at the JCMC during a time when a high-risk radiologist was scheduled to be on-duty.

McKenney appeared on August 16 at the JCMC sonogram office as instructed. When De was unable to locate the high-risk radiologist, she took several sonogram images of McKenney. Like the August 13 sonograms, the August 16 sonogram was not a specialized image, but was another gestational study. Although a physician should have been on-duty to interpret the August 16 images, De was unable to locate one. De instead gave those images to the Ob/Gyn secretary for the doctor. A sheet of paper accompanying the August 16 sonogram file also contained the

"follow-up study suggested" notation. De denied writing the notation in her deposition testimony, but she admitted writing it at trial. Again, De's actions arguably exceeded the role of "mere" technician. No JCMC or FHC doctor ever interpreted the August 16 sonogram images and hence no doctor ordered or suggested a follow-up study.

McKenney continued to appear at the FHC for scheduled appointments. FHC doctors ordered at least three other sonogram studies, and those studies either were never conducted, conducted but never interpreted, or conducted and interpreted without resulting in a diagnosis of spina bifida. No doctor made a diagnosis of spina bifida until delivery, when a doctor inadvertently ruptured the amniotic sac on Jarrell's back (a malformation associated with spina bifida) while easing Jarrell through the vaginal passage.

Approximately six months after De was dismissed from the case as a defendant, the lone attorney for the JCMC and the FHC called De as a witness at trial. At the close of De's direct examination, plaintiffs' attorney informed the trial court that De had contradicted her deposition testimony given eighteen months earlier, and moved for a mistrial "to bring [De] back into the case," to interview De out of the presence of the jury, and "for some time to prepare the cross-examination." The trial court denied all of those applications.

Thereafter, Dr. Hu testified on his own behalf. Plaintiffs' attorney cross-examined Dr. Hu, but never moved for a mistrial on the basis of his changed testimony or to exclude any portion of his testimony that deviated from his deposition testimony. The defense also offered testimony by Drs. Kim and Prezioso, and by experts respecting Jarrell's condition and the responsibilities of Ob/Gyn physicians.

The ten-member jury found no negligence on the part of Drs. Kim and Prezioso. The jury unanimously found Dr. Hu negligent, but by a vote of nine to one determined that his negligence did not deprive McKenney of the opportunity to terminate her pregnancy

in the second trimester. Similarly, by a vote of nine to one the jury found that Jarrell's condition was not made more serious due to the vaginal rather than caesarian delivery. Plaintiffs moved for a judgment notwithstanding the verdict or, in the alternative, for a new trial, but the trial court denied that motion.

Plaintiffs appealed, contending, among other things, that the trial court should have declared a mistrial when De's and Hu's trial testimony sharply deviated from their deposition testimony. The Appellate Division affirmed. *McKenney, supra,* 330 *N.J.Super.* at 577, 607, 750 *A.*2d 189. We granted certification, "limited to the issues of whether defense counsel were obligated to communicate material changes in defendants' testimony to plaintiffs prior to trial and whether plaintiffs were entitled to a mistrial as a matter of law due to defendants' failure to make such disclosures." 165 *N.J.* 607, 762 *A.*2d 221 (2000).

## II.

### *A.*

The critical issue in this appeal is whether defense counsel knew or should have known prior to a material witness testifying that that witness's trial testimony would significantly and materially differ from his or her deposition testimony. At oral argument before us, counsel for the JCMC and the FHC conceded that he learned the night before De's trial testimony that De would change her testimony. Counsel for the JCMC and the FHC did not disclose to plaintiffs' counsel the fact that De would change her testimony. Private counsel for De maintains that he was unaware that De would change her deposition testimony.

We agree with the Appellate Division's description of what defense counsel knew and when, and with its legal analysis concerning a lawyer's duty of disclosure in such circumstances.

Hu acknowledged that at some point prior to trial, he reviewed the logbook and learned that the sonogram taken on August 13, 1990 was conducted at the JCMC and not at the FHC as he initially believed. This led him to conclude that he did not examine the sonogram images on August 13 but instead reviewed them toward the end of August after they were forwarded to the FHC. The record indicates that although Dr. Kim's attorney had physical possession of the logbook during the first week of trial, the logbook was not made available to plaintiffs' counsel until July 3, 1997. The judge barred the defense from using the logbook. Hu testified on July 15, 1997. It is difficult for us to believe that the attorneys for Hu and the JCMC were not informed of this development, Hu's prospective change in testimony, prior to trial. Careful examination of the attorneys' opening statements suggest that they were aware of it and anticipated Hu's newly adopted position that he examined the August 13 sonogram toward the end of August. We believe it axiomatic that the attorneys were duty-bound to inform plaintiffs' counsel of Hu's radical change of position.

In a related area, we have held that a party has a continuing duty to disclose the opinions of its experts and a failure to do so may, in the trial judge's discretion, result in the exclusion of that expert's opinion evidence. *See, e.g., Waters v. Island Transp. Corp.*, 229 *N.J.Super.* 541, 548, 552 *A.*2d 205 (App.Div.1989); *Fanfarillo v. East End Motor Co.*, 172 *N.J.Super.* 309, 312, 411 *A.*2d 1167 (App.Div.1980); *Maurio v. Mereck Construction Co., Inc.*, 162 *N.J.Super.* 566, 569, 394 *A.*2d 110 (App.Div.1978); *Hamilton v. Letellier Construction Co.*, 156 *N.J.Super.* 336, 338, 383 *A.*2d 1168 (App.Div.1978); *Clark v. Fog Contracting Co.*, 125 *N.J.Super.* 159, 161, 309 *A.*2d 617 (App.Div.), *certif. denied,* 64 *N.J.* 319, 315 *A.*2d 408 (1973). Even if no written report is prepared, we have said that a party must disclose the substance of its expert's report in advance of trial. *Clark v. Fog Contracting Co.*, 125 *N.J.Super.* at 161–62, 309 *A.*2d 617. Where, as here, an attorney knows that his client or a material witness intends to deviate from his deposition testimony in a crucial way, we believe that the attorney has an ethical obligation to convey that fact to his adversary.

Our procedures for discovery are designed to eliminate the element of surprise at trial by requiring a litigant to disclose the facts upon which a cause of action or defense is based. *See Saia v. Bellizio,* 103 *N.J.Super.* 465, 468, 247 *A.*2d 683 (App.Div.), *aff'd,* 53 *N.J.* 24, 247 *A.*2d 865 (1968). The search for truth in furtherance of justice is paramount. *Caparella v. Bennett,* 85 *N.J.Super.* 567, 571, 205 *A.*2d 466 (App.Div.1964). This basic principle is designed to ensure that the outcome of litigation shall depend on its merits in the light of all of the available facts, rather than on the craftiness of the parties or the guile of their counsel. *Lang v. Morgan's Home Equipment Corp.,* 6 *N.J.* 333, 338, 78 *A.*2d 705 (1951). By contrast, JCMC's position is akin to trial by ambush. *Plaza 12 Associates v. Carteret Borough,* 280 *N.J.Super.* 471, 477, 655 *A.*2d 961 (App.Div.1995). Although our rules of practice do not specifically provide that there is a continuing duty to disclose where it can reasonably be anticipated that a party or material witness will depart significantly from his or her deposition testimony, their purpose and spirit mandate such a course. We thus take this opportunity to make explicit what is plainly implicit in our discovery practice.

We have found no reported New Jersey opinion dealing with the precise issue. The Federal Rules of Procedure require a party to supplement its pretrial disclosures if it "learns that in some material respect the information disclosed is incomplete or incorrect...." *Fed.R.Civ.P.* 26(e)(1). Although the Advisory Committee's notes indicate that the provision establishing a continuing duty to disclose does not apply to deposition testimony, the express language of the Rule is not so limited. Moreover, the Rule has been said to apply where a party has deliberately concealed "new facts" inconsistent with its deposition testimony. *Bunch v. United States,* 680 *F.*2d 1271, 1281 (9th Cir.1982).

We think this is the correct position. An attorney is under a duty seasonably to apprise his adversary where he obtains information upon the basis of which he knows that his client's or witness's prior deposition was incorrect in a material respect when made, or he knows that the deposition, though correct when made, is no longer true in a material respect. We emphasize that this principle does not place a greater risk on an attorney than he now has when he learns of a significant change in a client's or witness's position. At present, an attorney's failure to apprise his adversary of such a change may result in sanctions, such as preclusion or the declaration of a mistrial.

Nor do we regard our conclusion as inconsistent with the attorney-client privilege. We have held that the privilege yields when confidential communications are made a material issue in a judicial proceeding. *United Jersey Bank v. Wolosoff,* 196 *N.J.Super.* 553, 567, 483 *A.*2d 821 (App.Div.1984); *see also Kinsella v. Kinsella,* 150 *N.J.* 276, 300–03, 696 *A.*2d 556 (1997); *Weingarten v. Weingarten,* 234 *N.J.Super.* 318, 330, 560 *A.*2d 1243 (App.Div.1989) (holding that wife waived attorney-client privilege to extent that her communications to her attorney were necessary to her husband's defense of her motion to vacate divorce settlement based on former husband's misrepresentations and to extent that information was not available elsewhere); *Arena v. Saphier,* 201 *N.J.Super.* 79, 88–89, 492 *A.*2d 1020 (App.Div.1985); *Valentin v. Bootes,* 325 *N.J.Super.* 590, 601, 740 *A.*2d 172 (Law Div.1998). The rule we have announced here applies only where a party has placed in issue a communication which goes to the heart of the claim in controversy. In that specific setting, the attorney-client privilege is pierced because the policy underlying the need for secrecy is outweighed by the interests of fairness and justice. *See In re Koslov [Kozlov],* 79 *N.J.* 232, 243–44, 398 *A.*2d 882 (1979). We perceive this as a minimal intrusion.

[*McKenney, supra,* 330 *N.J.Super.* at 586–590, 750 *A.*2d 189 (footnote omitted).]

■ We agree completely with the Appellate Division's analysis and conclusion that defense counsel had a continuing obligation to disclose to the trial court and counsel for plaintiffs any anticipated material changes in a defendant's or a material witness's deposition testimony. Lawyers have an obligation of candor to each other and to the judicial system, which includes a duty of disclosure to the court and opposing counsel. *Kernan v. One Washington Park Urban Renewal Assocs.,* 154 *N.J.* 437, 461–67, 713 *A.*2d

411 (1998) (Pollock, J., concurring). As Justice Douglas wrote, "discovery and pretrial procedures make a trial less a game of blind man's [bluff] and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." *United States v. Proctor & Gamble Co.*, 356 *U.S.* 677, 683, 78 *S.Ct.* 983, 986–87, 2 *L.Ed.*2d 1077, (1958). "Modern litigation is too time consuming and expensive for courts to tolerate discovery abuses. For over fifty years, courts have endeavored to transform civil litigation from a battle royal to a search for truth." *Kernan, supra,* 154 *N.J.* at 467, 713 *A.*2d 411 (Pollock, J., concurring).

■ The fact that plaintiffs' counsel may have been remiss in some respects begs the question of whether defense counsel should have made an early disclosure that a party and a former party who would be called as material witnesses would change their testimony. We hold that such disclosure was required. Although plaintiffs' counsel did not make a formal motion to vacate the summary judgment dismissing the complaint as to De, that was part of the relief sought at the end of her testimony on direct. That issue was preserved under *Rule* 1:7–2. Furthermore, the motion for a mistrial at the end of De's direct testimony preserved plaintiffs' right to seek a new trial as to all defendants. *State v. Farrell,* 61 *N.J.* 99, 106, 293 *A.*2d 176 (1972).

### B.

■ The final issue is what should be the remedy for non-disclosure of the surprise testimony. The prejudicial impact of the unanticipated testimony can best be understood when viewed in the context of one of the causes of action.

■ McKenney's "wrongful birth cause of action is predicated on [her] right to determine for herself whether or not to continue or terminate her pregnancy." *Canesi v. Wilson,* 158 *N.J.* 490, 501, 730 *A.*2d 805 (1999). Deprivation of that right by a health care provider's alleged negligent misconduct "'creates a cause of action in the parents.'" *Ibid.* (quoting *Schroeder v. Perkel,* 87 *N.J.* 53, 66, 432 *A.*2d 834 (1981)). The gravamen of the

cause of action "consists of the parents' lost opportunity to make the personal decision of whether or not to give birth to a child who might have birth defects." *Ibid.* A wrongful birth claim can arise when a health care provider, such as a physician, fails to detect a discoverable fetal defect, *Berman v. Allan,* 80 *N.J.* 421, 404 *A.*2d 8 (1979), or fails to interpret diagnostic test results properly, *Procanik v. Cillo,* 97 *N.J.* 339, 478 *A.*2d 755 (1984). In such claims, parents are not required to prove medical causation in the sense that a physician's negligence caused the birth defect. Rather, the nature of the cause of action requires the parents to prove that the defendant's negligence was a proximate cause of the parents being deprived of the option to have an elective abortion. In the present case, McKenney's wrongful birth cause of action is based on the assertion that certain defendants failed to detect a discoverable fetal defect—spina bifida—soon enough after the August 13, 1990 sonograms to permit her and her husband to make an informed and meaningful decision either to terminate the pregnancy, or to give birth to a child with major congenital defects.

The surprise testimony was prejudicial to plaintiffs for several reasons. First, both De and Dr. Hu testified after plaintiffs had concluded their trial preparations, which had extended over several years. More damaging, the surprise evidence was heard by the jury after plaintiffs had concluded their evidentiary presentation. That substantially deprived plaintiffs' counsel of a reasonable opportunity to challenge their testimony. Second, this was a close case from its inception in that plaintiffs had about a two-week narrow window of opportunity during which an abortion was a viable option. Third, although the summary judgment order dismissing De from the case precluded defendants from arguing the "empty-chair" defense to the jury, that order did not preclude De from accepting more responsibility than had been the case in her depositions. The primary liability sought to be imposed against the JCMC and the FHC was that of *respondeat superior:* when an employee such as De is liable for acts performed within the scope of the employee's employment, so too is the hospital. *Tice v. Cramer,* 133 *N.J.* 347, 355, 627 *A.*2d 1090 (1993). Here,

neither De nor the JCMC was a real party in the case at the time of trial. In addition, some of De's surprise testimony was extremely beneficial to Dr. Hu.

At trial De testified, contrary to her deposition testimony, that she had written the notation "follow-up study suggested" on the August 13 sonogram report. She testified at her depositions that the only abnormality she observed on the August 13 sonogram was a "membrane," meaning that McKenney might have been pregnant with twins. At trial De testified that she knew what a lemon sign looked like in August 1990 and that a lemon sign appeared on the August 13 sonograms. Yet, De testified that she did not make such a notation on the sonogram report, but brought an unidentified doctor into the room with McKenney to point it out to the doctor. In her depositions, De never said that she showed the August 13 sonogram to a high-risk doctor, or that she suggested a "follow-up study" after observing the lemon sign, or that she performed a second gestational sonogram on August 16.

When De's depositions were taken while she was a defendant in the case, she gave testimony portraying her role in the care provided to McKenney as that of a mere technician—one who acts only on orders from a doctor. In contrast, when she was no longer a defendant in the case, her trial testimony indicated that she was more than a mere technician. Rather than being the person who executed a doctor's order to perform sonograms, she wrote the request for sonograms on two occasions and performed the August 16 sonogram that she previously had requested. In addition, she performed a gestational sonogram on August 16 knowing, according to her testimony, that an unidentified doctor had reviewed the August 13 sonogram and had detected abnormalities that persuaded that physician to order a specialized and more sophisticated diagnostic sonogram by a "high-risk" radiologist to determine the nature of those abnormalities. Finally, De testified at trial that although she observed a lemon sign on the August 13 sonogram, she requested a "follow-up study" and then performed a second gestational sonogram on August 16. By enhancing her

role in the case, defense counsel did not have to use the "empty chair defense" because De made· that strategy unnecessary—she inculpated herself.

Equally as surprising was Dr. Hu's testimony that he may not have looked at the August 13 sonogram until more than a week after it was taken—approaching the end of August. That was a critical change because Dr. Hu's new testimony placed McKenney beyond the outer limit for obtaining a legal abortion. Accordingly, when the jury found that Dr. Hu was negligent, under the theories of liability asserted against him, that finding reflected a jury determination that he failed to detect spina bifida in the sonograms taken on August 13 or August 16 and/or that he failed to obtain a more sophisticated sonogram. The question for the jury then became whether that negligence occurred at a time at which it was a proximate cause in depriving McKenney of the opportunity to obtain an abortion before the narrow window of time elapsed. When Dr. Hu was permitted to use the logbook, which was otherwise excluded from evidence, to refresh his recollection that because the August 13 sonogram was taken at the JCMC he did not review that sonogram until the end of August, that surprise testimony had the clear capacity to influence the jury's decision on proximate cause. It was Dr. Hasanee who requested the August 13 sonogram. Whenever Dr. Hu saw the two sonograms, he did not diagnose spina bifida. Hence, if the jury believed that his negligence occurred after it was too late to get an abortion, his surprise trial testimony coupled with the use of the logbook clearly prejudiced plaintiffs. Dr. Hu's reference to the logbook, independent of its exclusion from evidence as a document, had the tendency to enhance his credibility in the eyes of the jury in terms of when his negligent conduct occurred.

Under the circumstances presented in this close case, we cannot view with confidence the jury's determination that Dr. Hu's negligence did not deprive McKenney of the opportunity to terminate her pregnancy during the second trimester. For plaintiffs to proceed to trial without being informed of the surprise testimony

created a " 'make believe' scenario [for plaintiffs], the legal equivalent of half a deck." *Buckley v. Estate of Pirolo*, 101 *N.J.* 68, 79, 500 *A.*2d 703 (1985). Plaintiffs went to trial misled by false information. Hence, the failure to grant a mistrial was an abuse of discretion. *State v. Winter*, 96 *N.J.* 640, 646–47, 477 *A.*2d 323 (1984); *Greenberg v. Stanley*, 30 *N.J.* 485, 503, 153 *A.*2d 833 (1959); *Wright v. Bernstein*, 23 *N.J.* 284, 296, 129 *A.*2d 19 (1957). The trial in this case was inconsistent with the spirit of our discovery rules, which are " 'designed to eliminate, as far as possible, concealment and surprise in the trial of lawsuits to the end that judgments therein be rested upon the real merits of the causes and not upon the skill and maneuvering of counsel.' " *Wymbs v. Township of Wayne*, 163 *N.J.* 523, 543, 750 *A.*2d 751 (2000) (quoting *Evtush v. Hudson Bus Transp. Co.*, 7 *N.J.* 167, 173, 81 *A.*2d 6 (1951)). "[C]oncealment and surprise are not to be tolerated." *Lang v. Morgan's Home Equip. Corp.*, 6 *N.J.* 333, 338, 78 *A.*2d 705 (1951).

### IV.

The judgment of the Appellate Division is reversed, and the matter is remanded for a new trial. Plaintiffs are granted leave to file a motion to vacate the judgment dismissing the case against De.

*For reversal and remandment*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—none.