**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4442-18

NANCY SISCO and
CARLA IRUSTA, Individually,
and NANCY SISCO as
Administratrix Ad Prosequendum
for the Estate of Rosa
Rodriguez-Sanchez, Deceased,

     Plaintiffs-Appellants,

v.

CHAN W. PARK, M.D.,

     Defendant-Respondent,

and

ALEJANDRO VAZQUEZ, M.D.,
ZIAD C. SIFRI, M.D., EDWARD
ANDRAOS, M.D., KARTIK
DANDU, M.D., UNIVERSITY
HOSPITAL, RUTGERS
BIOMEDICAL and HEALTH
SERVICES, and STATE OF
NEW JERSEY,

     Defendants.

_____

Argued December 14, 2020 – Decided April 26, 2021

Before Judges Messano, Hoffman and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0789-16.

G. Martin Meyers argued the cause for appellants (Law Offices of G. Martin Meyers, PC, attorneys; G. Martin Meyers, on the briefs).

Beth A. Hardy argued the cause for respondent (Farkas & Donohue, LLC, attorneys; Evelyn Farkas, of counsel; Beth A. Hardy, on the brief).

PER CURIAM

Plaintiffs Nancy Sisco and Carla Irusta are respectively the daughter and grand-daughter of Rosa Rodriguez-Sanchez, who, on June 15, 2015, at the age of eighty-three, underwent surgery to remove a Stage III cancerous lesion in the anterior portion of the floor of her mouth. In addition to excising the cancer, the procedure required defendant Dr. Chan W. Park, board-certified in otolaryngology with a sub-specialty in head and neck surgery, to graft a piece of skin from Rosa's forearm onto the surgical site, make surgical vascular connections, and remove some lymph nodes in her neck to assure the cancer had

A-4442-18

not spread.[1]  Defendant elected not to perform a tracheostomy[2] intraoperatively, concluding it was unnecessary to keep Rosa's airway open during or after surgery.  Following the seven-to-eight-hour surgery, Rosa remained sedated, was moved to the surgical intensive care unit (SICU) and left with an endotracheal breathing tube in place.

Rosa was generally in good health and tolerated the surgery well.  According to defendant, he checked his patient's status early the following morning and noted she was in no acute distress, nor was there extensive swelling in her mouth.  Plaintiffs, however, disputed defendant's characterization of Rosa's post-operative condition.  They said Rosa was uncomfortable for most of the day and her mouth was swollen.  There was a discharge of bloody fluid from Rosa's mouth and neck, and they were frustrated by unsuccessful attempts to speak with defendant, except for a short conversation on the hospital elevator.

Defendant said he checked on Rosa again around 2 p.m., after she was extubated, to examine the skin graft.  He expressed some concern about the

---

[1]  We sometimes use the first names of plaintiffs and decedent in this opinion for ease of reference.  We intend no disrespect by this informality.

[2]  A tracheostomy, or tracheotomy, is "[t]he operation of opening into the trachea, usually intended to be temporary."  Stedman's Medical Dictionary 1830 (26th ed. 1995).

A-4442-18

swelling and blood flow to the "flap" of skin and removed two of the twenty sutures, which, he concluded, improved the situation. According to defendant, Rosa was "breathing comfortably," speaking to him and her family, and had experienced no swelling of her tongue. Defendant said he checked her again at 6 p.m. and Rosa was "breathing, talking, no swelling, no airway issues."

However, it was undisputed that at approximately 3:15 a.m., an "acute event" occurred. Rosa's blood oxygen saturation levels dropped precipitously, and she went into cardiac arrest. The SICU staff performed a cricothyrotomy[3] to access her airway and alerted defendant, who arrived at the hospital and performed an emergency tracheostomy. By then, Rosa had suffered an anoxic brain injury that left her unable to walk or speak for the remainder of her life. She died approximately eighteen months later, in February 2017.

In the interim, plaintiffs filed suit alleging lack of informed consent and medical malpractice by defendant and other medical providers. Upon Rosa's demise, plaintiffs amended the complaint adding claims for her wrongful death and survival damages; the amended complaint added other health care providers

---

[3] A cricothyrotomy is an "[i]ncision through the skin and cricothyroid membrane for relief of respiratory obstruction; used prior to or in place of tracheotomy in certain emergency respiratory obstructions." Stedman's Medical Dictionary 411 (26th ed. 1995).

as defendants.  Ultimately, the court dismissed the wrongful death claim and all claims against the other defendants, and the case proceeded to trial solely against defendant on plaintiffs' survival action.  See Warren v. Muenzen, 448 N.J. Super. 52, 57 (App. Div. 2016) (explaining the nature of and differences between a wrongful death claim and a survival action).

After deliberating for slightly less than one hour, the jury found no cause of action on both the informed consent and negligence claims.  Plaintiffs moved to set aside the no cause judgment pursuant to Rule 4:50-1(c), arguing that without prior notice, defendant had materially changed his trial testimony from that given during his deposition.  See McKenney v. Jersey City Med. Ctr., 167 N.J. 359, 370 (2001) ("Where . . . an attorney knows that his client or a material witness intends to deviate from his deposition testimony in a crucial way, we believe that the attorney has an ethical obligation to convey that fact to his adversary.").  Plaintiffs also moved for a new trial, alleging various trial errors. The judge denied both motions, and this appeal ensued.

Before us, plaintiffs appeal the orders denying their motions for a new trial and to vacate the judgment of no cause by essentially reasserting the arguments made in their post-verdict motions.  We have considered these contentions and affirm.

5

# I.

We set some well-known guideposts for our review. Rule 4:49-1(a) provides that the trial court shall grant a motion for a new trial if "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." Jury verdicts, however, are "entitled to considerable deference and 'should not be overthrown except upon the basis of a carefully reasoned and factually supported (and articulated) determination, after canvassing the record and weighing the evidence, that the continued viability of the judgment would constitute a manifest denial of justice.'" Hayes v. Delamotte, 231 N.J. 373, 385–86 (2018) (quoting Risko v. Thompson Muller Auto. Grp., Inc., 206 N.J. 506, 521 (2011)).

We review the denial of a motion for a new trial using the same standard as the trial judge, "whether there was a miscarriage of justice under the law." Id. at 386 (quoting Risko, 206 N.J. at 522). "[A] 'miscarriage of justice' can arise when there is a 'manifest lack of inherently credible evidence to support the finding,' when there has been an 'obvious overlooking or under-valuation of crucial evidence,' or when the case culminates in 'a clearly unjust result.'" Ibid. (quoting Risko, 206 N.J. at 521–22).

A-4442-18

In our review, however, we "must give 'due deference' to the trial court's 'feel of the case.'" Risko, 206 N.J. at 522 (quoting Jastram v. Kruse, 197 N.J. 216, 230 (2008)).

> Although an appellate court has a duty to canvass the record to determine whether a jury verdict was incorrect, that verdict should be considered "impregnable unless so distorted and wrong, in the objective and articulated view of a judge, as to manifest with utmost certainty a plain miscarriage of justice."
>
> [Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 135 (1990) (quoting Carrino v. Novotny, 78 N.J. 355, 360 (1979)).]

Rule 4:50-1(c) permits a court to vacate a judgment based upon "fraud . . . misrepresentation, or other misconduct of an adverse party[.]" In arguing their post-verdict motion, plaintiffs alleged defendant perjured himself at trial.

> Perjured testimony that warrants disturbance of a final judgment must be shown by clear, convincing and satisfactory evidence to have been, not false merely, but to have been willfully and purposely falsely given, and to have been material to the issue tried and not merely cumulative but probably to have controlled the result.
>
> [Gilgallon v. Bond, 279 N.J. Super. 265, 267 (App. Div. 1995) (quoting Shammas v. Shammas, 9 N.J. 321, 330 (1952)).]

A-4442-18

## II.

The trial record patently reveals the highly contentious nature of the proceedings. Judge Bruno Mongiardo, now retired, did a commendable job maintaining the order and dignity of the courtroom, but only by frequently cautioning both lawyers, who constantly spoke over each other and oftentimes interrupted the judge.

Plaintiffs argue that alleged "McKenney violation[s]" resulted in a "trial by ambush." The claim is premised upon comments in defense counsel's opening statement, defendant's trial testimony, and the trial testimony of defense liability expert, Dr. Rod Rezaee. We provide context for each leg supporting plaintiffs' overarching claim.

### A.

#### i

As we discuss in greater detail below, the trial court limited plaintiffs' claim of deviation from accepted standards of medical care to defendant's decision not to perform a tracheostomy "intraoperatively." Plaintiffs contended that failure meant swelling in Rosa's oral cavity resulted in an airway obstruction that triggered the cascading series of events leading to her anoxic brain injury and final vegetative state. In her opening statement, defense counsel sought to

rebut any inference that a tracheostomy was a benign procedure posing little risk of complications. She told the jury:

> [Defendant] will tell you that in his experience, in all of the cases where he made the intraoperative decision not to do a tracheostomy, he's never had this happen ever.
>
> . . . .
>
> [A] tracheostomy is another operative procedure. . . . You're making an incision . . . and . . . putting a tube . . . into the trachea. The risks include bleeding, infection. They include obstruction of the airway . . . . [Y]ou can have an obstruction of the airway if you do a tracheostomy or you don't do a tracheostomy.
>
> So, in [defendant's] experience, he's actually had very good success with this surgery, <u>but he has actually had a patient die from bleeding from a tracheostomy, one of his patients</u>. . . . [I]t's not a benign nothing procedure . . . and you have to decide does this patient need it.
>
> [(Emphasis added).]

Plaintiffs' counsel did not object, and immediately after openings concluded, Carla was called as a witness and testified for approximately forty-five minutes before the trial recessed for the day.

At the start of the following day's proceedings, plaintiffs' counsel asked for a curative instruction regarding the reference to defendant's unidentified patient who died after he performed a tracheostomy. Counsel noted that

9 <span style="float:right">A-4442-18</span>

defendant never previously disclosed that incident or that it was "a reason for anything he did or didn't do." He accused defendant of "willfully conceal[ing]" the incident during discovery, likened the remark to "drop[ping] a bomb" and a "classic example of trial by ambush," and claimed the comment was so prejudicial that a curative charge was necessary.

After listening to defense counsel's response, the judge noted it was fair for defendant to assert that, contrary to plaintiffs' position, a tracheostomy posed risks that outweighed its necessity in this case. However, he correctly concluded it was improper for defense counsel to refer to a specific, unidentified patient who suffered a fatal result, particularly because the judge would not permit defendant to testify about it since it was never revealed in discovery. Noting the passage of time since defense counsel's remarks and Carla's intervening testimony, the likelihood that jurors would forget the comments certainly by the end of trial, and that expert testimony would explain for the jurors the risks of such a procedure, the judge declined to give a curative instruction.[4] In rendering his decision on the post-verdict motions, the judge did not specifically address the issue.

---

[4] Defendant did not reference the incident at all during his testimony.

A-4442-18

In interrogatory answers, defendant referred plaintiffs to his operative report (the report) explaining the procedure he performed on Rosa. Plaintiffs posed a specific supplemental interrogatory that asked why defendant had not performed a tracheostomy "in the course of or immediately following" the surgery. Defendant answered by directing plaintiffs to the report, which said he observed no swelling of Rosa's tongue and no significant swelling of the skin graft, so defendant decided not to perform a tracheostomy "due to the minimal swelling and to just leave [Rosa] intubated til tomorrow or until swelling resolved."

At defendant's deposition, which took place before any of the liability experts' reports were served, plaintiffs' counsel referred to this portion of the report and asked, "Were there any other considerations that you took into account in connection with your decision about whether or not to perform a tracheostomy?" Defendant responded, "I don't believe so." However, that exchange was immediately followed by questions regarding other factors, for example, Rosa's age and that she was asthmatic. Earlier, plaintiffs' counsel asked defendant to explain why a tracheostomy would sometimes be performed in connection with Rosa's type of surgery, and defendant explained it would

11

"bypass" "anticipated swelling," avoid prolonged ventilator status and aid post-operative pulmonary care and "toilet." At trial, plaintiffs' expert, Dr. Michael Morris, said that his analysis of four factors — the location of the surgery in the oral cavity, the size and extent of the resection, the swelling visible at the end of the surgery, and the concurrent neck dissection — led him to opine that the requisite standard of medical care required an intraoperative tracheostomy in anticipation of a possible airway obstruction.[5]

When he testified on direct examination at trial, defendant was asked to explain his "thought process during the surgery as to whether or not a tracheostomy needed to be done." He described the location of the surgery in the anterior of Rosa's mouth, removal of a limited number of lymph nodes on only one side of her neck, and the lack of significant swelling after the lengthy surgery. Defense counsel referred defendant to the report's reference to these issues. Plaintiffs' counsel posed a single objection, which the judge overruled, when defendant was asked why he had performed tracheostomies in other cases.

On cross-examination, plaintiffs' counsel almost immediately referenced defendant's deposition testimony. Defendant did not deny the answer previously

---

[5] In summation, plaintiffs' counsel broke these down into "five increased risk factors."

given and said his answer — a lack of any significant swelling — reflected his "intraoperative decision."  Counsel continued in his attempt to have defendant admit that he never cited any other factors that militated against performing the tracheostomy, and defendant responded by stating his deposition answer was limited and in response to a question about his report.  Ultimately, the attorneys went to sidebar, where the judge said:

> [Defendant's] answer is very clear.  He's already answered it twice.  Now he has basically said his interpretation of that question at the dep had to deal with an intraoperative decision. . . .  Whether you (plaintiffs' counsel) like that or not, you can deal with it.  But I can't allow it to be asked over and over.

In his summation, plaintiffs' counsel argued extensively that defendant's trial testimony was inconsistent with his deposition testimony and his failure to consider other factors resulted in the erroneous decision not to perform a tracheostomy.

As noted, plaintiffs' Rule 4:50-1 motion was premised on defendant's "perjured" testimony at trial and the Court's holding in McKenney.  Judge Mongiardo noted that counsel "had the opportunity to thoroughly deal with" defendant's allegedly inconsistent testimony "on cross-examination" and in summation.  The judge also noted his final instructions told the jury to consider inconsistencies in the testimony of all the witnesses, and explanations given for

13                                                                    A-4442-18

those inconsistencies, when judging credibility. In his oral decision issued after argument on the motions, the judge rejected any claim that defendant had perjured himself or there was a <u>McKenney</u> violation.

iii

It was undisputed Rosa suffered a heart attack at approximately 3:15 a.m. on June 17. Plaintiffs moved in limine to bar defendant from presenting any evidence that Rosa had "a heart problem aside from the cardiac arrest that occurred on [June] 17." Defense counsel responded, "We're not going to blame her situation on a heart problem that resulted in her cardiac arrest." Plaintiffs' counsel told the judge: "[T]hey can say that there was a cardiac arrest . . . that they don't know the cause . . . I just don't want the argument to be made that there's reason to believe that this woman simply had a heart attack."

Dr. Rezaee testified that no one could say with certainty what caused the acute incident in the early morning of June 17; defense counsel asked, "What are some of the possibilities?" He responded, "Mucous plugging," a collection of mucous that suddenly blocked Rosa's windpipe, or an "arrhythmia . . . a short circuiting of the heart causing it to beat funny . . . ." Plaintiffs' counsel objected, and the judge sustained the objection. Plaintiffs cited the doctor's testimony as further support for a new trial.

14

In his oral decision denying plaintiffs' motions, the judge noted that while it was undisputed Rosa suffered a cardiac arrest, the reason was disputed. "The fact that there were other possible causes for the arrest was a permissible area of inquiry, particularly, when defendant's . . . expert's report commented . . . that the [failure to perform the] tracheostomy was not the cause of [Rosa's] arrest." Judge Mongiardo observed that plaintiffs' counsel "was well aware of this fact. In essence, plaintiff[s] sought to shift the burden of proof to . . . defendant."

The judge determined that having decided defendant was not negligent for failing to perform an intraoperative tracheostomy, the jury never needed to decide what caused Rosa's cardiac arrest. The judge cited the Court's opinion in Campo v. Tama, where it held, "because the jury found that [the defendant doctor] had not been negligent in treating [the plaintiff], it properly did not reach the issue whether the alleged negligence" was a proximate cause of the spread of the plaintiff's cancer. 133 N.J. 123, 133 (1993).

## B.

Having reviewed the complete record, none of these contentions support plaintiffs' claim that they were entitled to a new trial for alleged McKenney violations or, as it relates solely to defendant's trial testimony, pursuant to Rule 4:50-1(c).

In McKenney, the plaintiffs sued the medical center and several staff members involved in the birth of their child who was afflicted with spina bifida. 167 N.J. at 364. The plaintiffs argued that the medical center and its staff failed to inform them that their child's condition, claiming that such information should have been seen on sonograms prior to the time that an abortion could have been lawfully performed. Ibid.

In his deposition, the defendant, Dr. Hu, the chief Obstetric/Gynecological (OBGYN) resident at Jersey City Medical Center (JCMC), acknowledged viewing the scans well in advance of the child's birth. Id. at 366. However, at trial, Dr. Hu changed his testimony, stating that upon review of a JCMC sonogram logbook that plaintiffs' counsel had unsuccessfully sought during discovery, he determined that he probably did not review the sonogram until weeks later after an abortion was no longer an option. Id. at 366–67. Another witness, a certified ultrasound sonographer who was previously a defendant in the case, also changed her testimony during trial from what she initially provided in her deposition. Id. at 367. It was later revealed that defense counsel learned of the change in testimony the night before trial and failed to notify plaintiffs' counsel. Id. at 369.

16

The Court concluded that "defense counsel had a continuing obligation to disclose to the trial court and counsel for plaintiffs any anticipated material changes in a defendant's or a material witness's deposition testimony." Id. at 371. Such a rule was consistent with the principles of fairness surrounding the obligation of candor between adversaries in the legal system. Ibid.

Individually or collectively, the three issues cited by plaintiffs fail to demonstrate a McKenney violation, or that defendant clearly and convincingly perjured himself, a necessary predicate to vacate a judgment pursuant to Rule 4:50-1(c).

Judge Mongiardo properly considered that defense counsel's opening remarks were made in advance of days of future testimony and would not likely be remembered by the jury. See, e.g., Amaru v. Stratton, 209 N.J. Super. 1, 16 (App. Div. 1985) ("The remarks by plaintiff at this early stage of the proceedings were not of such moment as to threaten [defendant's] enjoyment of a fair trial."). Defense counsel's comments were brief, and the substance of the comments was not repeated. See, e.g., Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009) ("Fleeting comments, even if improper, may not warrant a new trial, particularly when the verdict is fair."). Moreover, plaintiffs' expert, Dr. Michael

Morris, acknowledged in his testimony that there were inherent risks in performing a tracheostomy.

Defendant's trial testimony, in which he acknowledged consideration of other factors in deciding not to perform a tracheostomy, was hardly akin to that which justified a new trial in McKenney. Both experts agreed that there were several factors to be considered in performing or not performing a tracheostomy intraoperatively, including factors mentioned in defendant's operative report. Defendant may not have cited them specifically in his deposition testimony; however, defendant was specifically asked in the deposition about other considerations. Moreover, as Judge Mongiardo explained, this trial was a battle of experts, and Dr. Morris admitted on cross-examination that although he had performed many tracheostomies, he was not qualified to and had never performed the same surgery as that which defendant performed on Rosa.

Finally, we do not agree with some of Judge Mongiardo's analysis of Dr. Rezaee's testimony. Whether a tracheostomy would have avoided the potential consequence of a blocked airway, i.e., cardiac arrest, was inexorably connected to plaintiffs' theory of the case. The jury's finding of no deviation does not mean the causation question was of no consequence.

However, we do agree with the judge's recognition that plaintiffs bore the burden of proof, not defendant. It was their burden to prove by a preponderance of the evidence that oral swelling blocked Rosa's airway, as Dr. Morris posited, and that defendant should have anticipated this and performed a tracheostomy intraoperatively. Thus, whether some other conditions, e.g., a mucous plug or temporary arrythmia, caused the cardiac arrest were medically plausible alternative explanations that the jury was entitled to consider in evaluating whether plaintiffs shouldered their burden. Defendant was under no obligation to prove, within a reasonable degree of medical certainty, what caused Rosa's cardiac arrest. These alternative causes were mentioned in Dr. Rezaee's report and, when plaintiffs' counsel objected to defendant's attempt to go further on cross-examination, the judge sustained the objection.

In sum, we affirm the orders denying a new trial based upon alleged McKenney violations and plaintiffs' motion to vacate the judgment pursuant to Rule 4:50-1(c).

### III.

Plaintiffs cite several alleged evidentiary errors as singly or collectively justifying a new trial. We address them seriatim by first recognizing the "well-established principle that '[e]videntiary decisions are reviewed under the abuse

19

of discretion standard because, from its genesis, the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion.'" Rodriguez v. Wal-Mart Stores, Inc., 237 N.J. 36, 57 (2019) (alteration in original) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383–84 (2010)). Ultimately, it is the job of the trial court to exercise its broad discretion "to determine both the relevance of the evidence presented and whether its probative value is substantially outweighed by its prejudicial nature." Ibid. (citing Wymbs v. Twp. of Wayne, 163 N.J. 523, 537 (2000)). Reversal based on alleged errors in evidentiary rulings is only proper when those rulings are "so wide off the mark that a manifest denial of justice resulted." Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

In summation, plaintiffs' counsel argued that defendant failed to produce a cardiologist to support the claim that Rosa experienced cardiac arrythmia; defense counsel objected, and the judge sustained the objection. Citing Bender v. Adelson, 187 N.J. 411, 433 (2006), plaintiffs now argue this was error.

The facts in Bender are inapposite. There, after barring a defense expert from testifying because of a discovery violation, the trial judge blocked the plaintiff's counsel's attempt to argue in summation that the defendant failed to

produce an expert that rebutted the plaintiff's case.  The Court determined that was reversible error.  Id. at 433–35.

In preliminary proceedings here, defense counsel agreed not to assert Rosa had an underlying heart condition that caused her cardiac arrest.  For the reasons already expressed, defendant did not assert, nor was he required to prove, that Rosa suffered cardiac arrest as the result of an arrythmia.  Plaintiffs were fully able to argue there was no proof that she did, noting that Rosa's heart rhythm returned to normal shortly after SICU doctors intervened, and she never experienced cardiac problems again.

Next, plaintiffs argue Judge Mongiardo improperly allowed Dr. Rezaee to cite an article that was published a year after Rosa's surgery in support of his position that failure to perform an intraoperative tracheostomy was not a deviation from accepted medical standards.  Plaintiffs claim the article supported a standard of care other than that recognized at the time of Rosa's surgery.

"In a medical-malpractice action, the plaintiff has the burden of proving the relevant standard of care governing the defendant-doctor[.]"  Komlodi v. Picciano, 217 N.J. 387, 409 (2014).  The standard must be based on the state of

scientific knowledge at the time of the alleged malpractice. <u>Kimmel v. Dayrit</u>, 301 N.J. Super. 334, 356 n.11 (App. Div. 1997).

The article in question, "Unfavorable Results After Free Tissue Transfer to Head and Neck: Lessons Learned at the University of Washington," was not published until October 2016. However, the data used in the study was collected over twenty years at the University of Washington, and defendant himself was involved in the research during his fellowship training. Essentially, the article supported the proposition that many surgical patients like Rosa suffered no adverse consequences when a tracheostomy was not performed.

Dr. Rezaee referred to the article in his expert report, and plaintiffs' expert, Dr. Morris, also referenced the article in his supplemental report. Dr. Morris was questioned about it at trial. Plaintiff mischaracterizes the article by claiming it enunciated a new standard of care. Rather, the article provided support for one opinion over another regarding the same standard of care, i.e., whether given the nature of Rosa's surgery, an anticipatory tracheostomy should have been performed.

Defendant wrote two prescriptions for Rosa to undergo pre-operative scans. Although the first took place, the surgery was scheduled before the second pre-operative CT scan was to occur. Carla testified in support of

22

plaintiffs' informed consent cause of action, stating defendant "didn't say anything" about the risks that accompanied Rosa's surgery. Plaintiffs sought to introduce testimony that when Carla brought to defendant's attention that the second scan had not taken place, he simply tore up the prescription and proceeded to perform the surgery.

Plaintiffs did not assert that the second scan was a prerequisite for the surgery or the failure to perform it compromised the surgery's success. In explaining his decision to bar the testimony, Judge Mongiardo explained:

> It's going to be for the jury to decide whether risks were or were not discussed. But to add that little extra to it, I think, is not going to add anything insofar as probative value is concerned. And it's certainly going to inject into the case prejudice. And that prejudice is going to greatly outweigh the questionable probative value, if any. So I'm not going to allow that.

"N.J.R.E. 403 specifically allows a judge, in his or her discretion, to exclude otherwise admissible evidence under specified circumstances. These decisions are reviewed under the abuse of discretion standard." Benevenga v. Digregorio, 325 N.J. Super. 27, 32 (App. Div. 1999) (citing State v. Erazo, 126 N.J. 112, 131 (1991)). Here, the evidence lacked any probative value on the question of informed consent and was intended to show, as the judge noted, defendant's alleged "arrogance." We find no mistaken exercise of discretion.

Plaintiffs contend the judge's decision to preclude the reading of the deposition of Dr. Andraos to the jury was in error. Dr. Andraos was a resident at the hospital and observed Rosa around 9 p.m. on the night following surgery and hours before the acute event that led to her anoxic brain injury. He noted swelling in the oral cavity and consulted the ENT team but not defendant directly.

Defendant said that Dr. Andraos did not contact him with any concerns about Rosa, and he was not notified until he was summoned to perform the emergency tracheostomy in the early morning hours of the following day. Dr. Andraos had moved to Texas by the time of trial and was unavailable for trial. In support of his decision to bar the deposition testimony, Judge Mongiardo explained:

> [A]rguably you might have a stronger argument if Dr. Andraos testified that he communicated this information to [defendant].
>
> . . . .
>
> He never did. And I can't have the jury then speculate, well, maybe he communicated to the ENT team or to the intensivists and maybe they then communicated. . . . No matter what Dr. Andraos may . . . have observed, if he did not specifically communicate that observation to [defendant,] it's too speculative.

24

Plaintiffs appropriately argue the deposition testimony should have been admitted if only to support their testimony that Rosa was in distress because of the oral swelling and claims regarding defendant's unavailability. However, we cannot conclude the exclusion of the evidence, even if error, requires reversal. See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result . . . .").

Lastly, plaintiffs contend the judge erred in limiting Dr. Morris's testimony, arguing the decision was in response to defendant's "unannounced" motion in limine, was "clearly erroneous" and was so "highly prejudicial" as to require reversal of the jury's verdict. We again disagree.

Before Dr. Morris testified, defense counsel asked the judge to limit the doctor's opinion to that expressed in his reports and at his deposition, namely, that defendant's only deviation from accepted standards was his failure to perform a tracheostomy intraoperatively in anticipation of a possible airway collapse. Plaintiffs' counsel objected, claiming the expert should be able to speak to "a couple of red flags in the developments afterwards that gave [defendant] the opportunity to change that decision and [defendant] should have acted . . . ."

Following an extended colloquy, Judge Mongiardo agreed with defendant. He explained that Dr. Morris's report and deposition addressed the factors that should have been anticipated at the time of the surgery, and that defendant deviated from the standard of care because he failed to anticipate a potential blockage of Rosa's airway and manage that possibility through an intraoperative tracheostomy. Now, the judge reasoned, plaintiffs were trying to add an additional alleged deviation, i.e., defendant's failure to perform a tracheostomy during Rosa's post-operative stay in the SICU.

An "expert's testimony at trial may be confined to the matters of opinion reflected in that report, . . . [h]owever, the logical predicates for and conclusions from statements made in the report are not foreclosed." Congiusti v. Ingersoll-Rand Co., 306 N.J. Super. 126, 131 (App. Div. 1997) (alteration in original) (quoting McCalla v. Harnischfeger Corp., 215 N.J. Super. 160, 171 (App. Div. 1987)). The decision to exclude expert testimony on the ground that it was not covered in the written report provided in discovery lies within the discretion of the trial court. Ibid. Generally, however, the testimony should not be excluded where there is "(1) the absence of a design to mislead, (2) absence of the element of surprise if the evidence is admitted, and (3) absence of prejudice which would

A-4442-18

result from the admission of the evidence." Id. at 131–32 (quoting Ratner v. Gen. Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990)).

We agree with Judge Mongiardo's rejection of plaintiffs' argument that permitting Dr. Morris to add defendant's post-operative acts or omissions as deviations from accepted medical standards of care was not a logical predicate or conclusion of his previously-expressed central opinion, i.e., that defendant should have anticipated the possibility of an airway collapse and performed a tracheostomy as part of the surgery. In fact, plaintiffs had named several doctors who attended Rosa in the SICU as defendants, and Dr. Morris addressed their potential liability in his initial report. However, those defendants were no longer in the case, and nothing in Dr. Morris's report or deposition opined that defendant deviated from accepted standards of care during that period of time.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4442-18